# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 12, 2003 Session
### Heard at Memphis

## STATE OF TENNESSEE v. RICHARD ODOM, a/k/a OTIS SMITH

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 91-07049     Chris Craft, Judge**

---

**No. W2000-02301-SC-DDT-DD - Filed May 21, 2004**

---

The defendant, Richard Odom, was convicted of felony murder and sentenced to death in 1992. This Court affirmed the conviction on direct appeal but remanded the case for a new sentencing proceeding. State v. Odom, 928 S.W.2d 18, 21, 33 (Tenn. 1996). After the new sentencing proceeding, a jury again imposed the death sentence after finding that the evidence of one aggravating circumstance, i.e., the defendant was previously convicted of one or more felonies, the statutory elements of which involved the use of violence to the person, outweighed evidence of mitigating circumstances beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-204(i)(2) (1991). The Court of Criminal Appeals affirmed the sentence.

After the appeal was automatically docketed in this Court, see Tenn. Code Ann. § 39-13-206 (1991), we entered an order specifying five issues for oral argument.[1] We now hold as follows: (1) the trial court committed reversible error by applying a 1998 amendment to Tennessee Code Annotated section 39-13-204(c) and allowing the introduction of evidence regarding the facts and circumstances of the defendant's prior felonies to support the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(2); (2) the trial court did not err in admitting photographs of the victim in this case but did err in admitting photographs of the victim of a prior felony offense committed by the defendant; (3) the trial court did not err in denying the defendant's motion for continuance to complete psychiatric or neuropsychological testing; (4) the death sentence was not invalid based on the failure of the indictment to charge the aggravating circumstance; and (5) the issue of whether the death penalty was excessive, arbitrary, or disproportionate in this case under the mandatory provisions of Tennessee Code Annotated section 39-13-206(c)(1)(A)-(D) need not be addressed at this time. We agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues and have included the relevant portions of that opinion in the appendix to this

---

[1] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.2.

opinion. Accordingly, we reverse the judgment of the Court of Criminal Appeals and remand for re-sentencing.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Reversed**

E. RILEY ANDERSON, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and ADOLPHO A. BIRCH, JR., and JANICE M. HOLDER, JJ., joined. WILLIAM M. BARKER, J., filed a dissenting opinion.

Robert C. Brooks, Memphis, Tennessee, for the Appellant, Richard Odom.

Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Phillip Gerald Harris and Amy Weirich, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

### Background

The defendant, Richard Odom, was convicted of first degree murder and sentenced to death for raping and killing seventy-seven-year-old Mina Ethel Johnson in 1991 in Memphis, Tennessee.[2] The evidence presented at the re-sentencing proceeding is summarized as follows.

### Prosecution's Evidence

On May 10, 1991, Mina Ethel Johnson's body was found on the back seat floorboard of her car in a parking garage in Memphis, Tennessee. The victim's lower body had been left exposed, and she was bleeding from her anus and vagina. There were multiple stab wounds in the victim's back and two bloody hand prints on her hips.

Sergeant Ronnie McWilliams of the Memphis Police Department testified that fingerprints found in the victim's car led to Odom's arrest on May 13, 1991. A search revealed that Odom was in possession of a "large knife," which he kept under his shirt. Odom initially told officers that his name was "Otis Smith" and that he had been imprisoned in Mississippi for a murder that occurred in 1978. Odom confessed that he intended to steal the victim's purse and forced her into the back seat of her vehicle. When the victim said, "What are you doing, son," Odom replied, "I'll give you your damn son." Odom admitted that he raped the victim and that the victim told him that she "never had sex with a man before." Odom admitted that the knife officers found in his possession

_____

[2] As noted above, this Court unanimously affirmed the conviction on direct appeal but remanded for re-sentencing because the trial court erred by excluding mitigation evidence offered by the defense and by refusing to instruct the jury on non-statutory mitigating factors. See State v. Odom, 928 S.W.2d 18, 32 (Tenn. 1996). A majority of the Court also concluded that the evidence did not support two of three aggravating circumstances found by the jury. Id. at 26-27 (Anderson, C.J., and Drowota, J., dissenting).

was the knife he used to stab the victim. He did not recall how many times he stabbed the victim. Odom said that he found no money in the victim's wallet or purse, and that he left the victim in her car and fled. McWilliams testified that the defendant was "open" and "kind of bragging a little bit about the situation."

Dr. Jerry Francisco, who performed an autopsy on the victim, testified that the victim bled to death from a stab wound to the right ventricle of her heart. The victim also had stab wounds to her liver and right lung and two defensive wounds to her right hand. The victim suffered tears to the posterior part of her vagina, which were caused by a traumatic event such as attempted penetration, and sperm was found in her vagina. Dr. Francisco testified that the injuries were inflicted while the victim was alive, that the wounds would not have caused instant death, and that the wounds would have caused immediate pain.

John Sullivan, a family friend, testified that Mina Ethel Johnson was a "shy, genteel" woman who had never married or had children and who was capable of managing her own affairs. Louise Long, the victim's sister, testified that the victim was retired from her job as secretary at an insurance company and was active in her church. She testified that the victim had broken her foot and was going to the doctor when she was killed. Long also stated that she missed the victim because she no longer had "any family at all to go to."

In addition to the evidence regarding this offense, the prosecution presented evidence regarding the facts of the defendant's two prior violent felony convictions to support the aggravating circumstance it relied upon to seek the death penalty. See Tenn. Code Ann. § 39-13-204(i)(2) (prior convictions for felony offenses whose statutory elements involved violence to a person). The prior felony convictions included a 1992 robbery conviction in Shelby County, Tennessee, and a 1998 first degree murder conviction based on events that occurred in 1978 in Rankin County, Mississippi, when the defendant was seventeen years old.

With regard to the 1992 robbery conviction, the prosecution presented the testimony of the victim, Lillian Hammond. Hammond testified that on May 8, 1991, she was approached by the defendant outside of her office at Shelby State Community College in Memphis, Tennessee. The defendant demanded Hammond's purse and threatened to kill or harm Hammond if she made any noise. Hammond testified that the defendant made vulgar sexual comments and said, "I want you." The defendant grabbed Hammond's arm and caused her to fall to the ground. He took Hammond's purse and ran away.

With regard to the 1998 first degree murder conviction, the prosecution presented evidence that the defendant killed the victim, Mary Rebecca Roberts, on May 4, 1978.[3] Terri Roberts, the victim's daughter, testified that her parents owned a drive-in theater in Pearl, Mississippi, and lived in a trailer next to the theater.

---

[3] The defendant pleaded guilty to this offense in 1978 and received a life sentence. After filing a successful petition for writ of habeas corpus in federal district court, the defendant was retried and again convicted in 1998.

A police officer, Ernest Simmons, testified that he was called to the Roberts' trailer and discovered the body of Mary Rebecca Roberts slumped in a recliner. The victim was covered in blood and had gunshot wounds to her face. The recliner apparently had been moved some nine feet from the wall and placed directly in front of the door. Two knives and bullet casings were found in the trailer. A bloody hand towel and a "stainless steel Army mess-kit knife" also were found in the trailer; the knife blade was bent at "a 90 degree angle." There were bloodstains in the trailer and at the drive-in where a safe was kept. Simmons testified that the murder weapon was a .22 caliber bolt action rifle that required reloading between shots.

According to Simmons, the police later questioned the defendant, then seventeen, who told officers that he went to the trailer because he was owed money. When Roberts tried to hit him with a flower pot, the defendant hit her and chased her to a bedroom. The defendant then stabbed the victim with a knife and forced her to leave her trailer and open a safe at the drive-in from which he took $255 and two guns. The defendant told police officers that he and the victim returned to the trailer and that he "sat her down" in a recliner. When Roberts pleaded for her life, the defendant told her, "Shut up. I'm trying to think." The defendant claimed that the victim was shot when she grabbed the barrel of the gun he was holding. The defendant admitted, however, that he shot the victim a second time because he "was scared" and "wanted to make sure she was dead." The defendant also admitted that he threw one of the guns into a swamp and hid the other gun and some of the money. Simmons testified that the defendant "showed no remorse" and had been "extraordinarily calm" when he gave his statement to police.

Dr. George Sturgis, who performed the autopsy, testified that Roberts had a fatal gunshot wound to her left eye, a fatal gunshot wound to the right side of her forehead, and a critical stab wound in her chest that had penetrated her left lung. The gunshot to the victim's forehead had been fired from close range. Dr. Sturgis also testified that the victim suffered lacerations and puncture wounds to her neck and chest, as well as bruises to her neck that suggested strangulation.

An assistant attorney general testified that the defendant had shown no remorse during the trial in 1998, and that the defendant exhibited an attitude as if it "was somewhat of a game." The prosecutor also testified that she saw no indication that the defendant was suffering from any mental illness.

<u>Defense Evidence</u>

The defendant presented several witnesses in mitigation at the re-sentencing proceeding. Gloria Shettles Johnson, a private investigator who assists attorneys with capital cases, testified that she obtained childhood records, conducted interviews, and prepared a social history that included the following information.

The defendant was born on August 13, 1960, in Mississippi. His parents had married when the father was eighteen and the mother was fifteen. The defendant had an older sister and a younger sister. The defendant was often left in day care for days at a time. The defendant's father drank

heavily, and his mother did not take care of the children. The defendant's parents gave him up for adoption when he was two and a half; he never again saw his mother and had only a brief encounter with his father at the age of thirteen.

According to Johnson, the defendant was adopted by Jimmy and Shirley Odom in 1963. Although Jimmy Odom was very "stern" and "loud," he was not physically abusive. About one year after the adoption, however, the Odoms divorced and Shirley Odom married Marvin Bruce. Bruce was "cruel to the children." He sexually abused the defendant and his step-brother and threatened to kill them if they told anyone. Bruce put hot sauce on the defendant's food and also put hot sauce directly in the defendant's mouth whenever the defendant asked for food. Bruce also berated the defendant into his teens for bed wetting on a regular basis. The defendant suffered from frequent episodes of sleep-walking; on one occasion, he urinated in the refrigerator while sleep-walking, and on several occasions, he urinated in a car.

At age twelve, the defendant began a pattern of delinquent behavior and running away from home. At age thirteen, the defendant was charged with larceny in the juvenile system and was institutionalized at the Columbia Training School. A psychologist at the institution diagnosed the defendant as schizoid and determined that he was "incorrigible," "brain damaged," and "not fit for society at age thirteen." At age fifteen, a psychologist conducted another evaluation and found that the defendant was "destined" to spend his life in institutions. At age sixteen, the defendant was released into the community on supervised juvenile parole. At age seventeen, the defendant murdered Mary Rebecca Roberts.

Johnson testified that one of the defendant's adoptive brothers, Larry Odom, had a criminal record and had served ten years in prison. Johnson was unable to verify whether a second adoptive brother, Jimmy Odom, had a record. Johnson acknowledged, however, that others who had grown up under the dominion and control of Marvin Bruce had not committed murder.

Johnson further testified that the defendant had earned a correspondence paralegal degree while in prison and had scored between 90 and 100% in several areas of the law. While imprisoned for the Mississippi murder of Mary Rebecca Roberts, the defendant's behavior was good enough to be transferred to a county jail where he was a cook and was elevated to "trustee" status. Johnson conceded that the defendant had been able to accomplish these things despite the 1974 psychological report that he was "brain damaged."

Dr. Dennis Earl Schmidt, a neuropharmacologist, testified that he, Dr. Steven Paul Rossby, and Dr. Benjamin Johnson visited the defendant in prison in 1999 to perform a court-ordered spinal tap. Dr. Schmidt later analyzed samples of the defendant's spinal fluid by using "high-performance liquid chromatography," and he testified that the test revealed the defendant had only about half the normal level of serotonin. He further explained that the level of serotonin found in the spinal column is directly indicative of serotonin function in the brain.

Dr. Rossby, a molecular neurobiologist, testified that Dr. Schmidt's test results indicated that the defendant's serotonin level was "severely, extremely abnormal" and the lowest level ever seen at his lab. Citing studies conducted in Finland and Sweden, Dr. Rossby explained that low serotonin levels are very strongly linked to "impulsive behaviors[,] includ[ing] unrestrained aggression, violence, [and] rage." Although Dr. Rossby stated that low serotonin levels could cause a person to exhibit low self-control of impulses, he explained that "whatever impulses that are released by this low self-control depends upon the individual, depends on their birth, depends on their heredity, depends on their early childhood experiences." He testified that the victim's use of the word "son" may have "served as a trigger to release the rage that [the defendant] felt toward his mother or mother figures . . . ."

Dr. Rossby conceded that low serotonin levels have also been associated with nonviolent behaviors such as eating disorders and gambling addiction. In addition, he admitted that there were no studies conclusively linking low serotonin levels to violent behavior and that he could not state that the defendant's low serotonin level caused him to commit the murder of Mina Ethel Johnson. Although the defendant had no problems controlling impulsive rage while in prison, Dr. Rossby stated that the ability to control impulses is not tested as often in the structured environment of prison.

Prosecution's Rebuttal Evidence

In rebuttal, the prosecution presented the testimony of Dr. John Hutson, a clinical psychologist. Although Dr. Hutson testified that he was quite impressed with Dr. Rossby's testimony as a whole, he opined that based upon the current scientific understanding of the role of serotonin, it cannot really be said "that serotonin causes anything." In addition, Dr. Hutson testified that he was not aware of any literature stating that there is a causal relationship between serotonin, violent behavior, obesity, depression, suicide, or other abnormal behaviors.

At the conclusion of the sentencing proceeding, the jury determined that the evidence of the single aggravating circumstance outweighed the evidence of mitigating circumstances beyond a reasonable doubt and sentenced the defendant to death for the felony murder of Mina Ethel Johnson. After the Court of Criminal Appeals affirmed the sentence, the case was docketed automatically before this Court.

**Analysis**

Evidence of Prior Felony Convictions

The first issue raised by the defendant is that the trial court improperly applied a 1998 statutory amendment to Tennessee Code Annotated section 39-13-204(c).[4] The 1998 amendment allows the prosecution to prove the facts and circumstances of the two prior felonies relied upon to establish the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(2), i.e., that the defendant had a prior conviction for a felony whose statutory elements included the use of violence to the person.

The defendant argues that the 1998 amendment was inapplicable because the offense was committed in 1991. The defendant argues that the error allowed the prosecution to rely on inadmissible evidence underlying his 1992 conviction for robbery and his 1998 conviction for first degree murder and that the error requires a new sentencing proceeding.

The State argues that the 1998 amendment is a procedural statute that was properly applied retroactively to the defendant's 1991 offense. The State asserts that even if the 1998 amendment cannot be applied retroactively, the evidence underlying the defendant's two prior violent felonies based on events in 1978 and 1991 was admissible to rebut the defendant's mitigation evidence. Finally, the State contends that if the evidence was not admissible, the error was harmless.

*Applicability of 1998 Statutory Amendment*

We begin our analysis by reviewing the language of Tennessee Code Annotated section 39-13-204(c) as it was worded in 1991 at the time of the offense in this case:

---

[4] In 1998, Tennessee Code Annotated section 39-13-204(c) was amended to add the following language:

> In all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction. Such evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of such evidence is outweighed by prejudice to either party. Such evidence shall be used by the jury in determining the weight to be accorded the aggravating factor.

1998 Tenn. Pub. Acts, ch. 915, § 1 (effective May 7, 1998). The statute also was amended in 1998 to expressly allow victim impact testimony. See 1998 Tenn. Pub. Acts, ch. 916, § 1. The amendment in chapter 916 does not represent a change in the law. See State v. Carter, 114 S.W.3d 895, 907 (Tenn. 2003). Our present analysis concerns only the amendment in chapter 915.

> In the sentencing proceeding, evidence may be presented as to any
> matter that the court deems relevant to the punishment and may
> include, but not be limited to, the nature and circumstances of the
> crime; the defendant's character, background history, and physical
> condition; <u>any evidence tending to establish or rebut the aggravating
> circumstances enumerated in subsection (i)</u>; and any evidence tending
> to establish or rebut any mitigating factors. Any such evidence which
> the court deems to have probative value on the issue of punishment
> may be received regardless of its admissibility under the rules of
> evidence; provided, that the defendant is accorded a fair opportunity
> to rebut any hearsay statements so admitted.

Tenn. Code Ann. § 39-13-204(c) (1991) (emphasis added).

When this pre-1998 version of the statute was applied to capital sentencing proceedings at which the State relied on the "prior violent felony" aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(2), this Court consistently held that it was "not appropriate to admit evidence regarding specific facts of the crime resulting in the previous conviction, when the conviction on its face shows that it involved violence or the threat of violence to the person." State v. Bigbee, 885 S.W.2d 797, 811 (Tenn. 1994); see also State v. Stout, 46 S.W.3d 689, 701 (Tenn. 2001). In contrast, the 1998 amendment now mandates that such evidence is admissible and must be considered in determining the weight of Tennessee Code Annotated section 39-13-204(i)(2).

The threshold question of whether the trial court committed error in applying the 1998 amendment retroactively in this case was recently resolved in State v. Powers, 101 S.W.3d 383 (Tenn. 2003). In Powers, we unanimously held that a trial court erred by applying the 1998 amendment in a case where the offense occurred "before the effective date of the amendment." Id. at 400. We relied upon State v. Smith, 893 S.W.2d 908, 919 (Tenn. 1994), in which this Court had held that the trial court properly instructed the jury on pre-1989 provisions of the capital sentencing statute where the offense had been committed before the enactment of the statutory provisions. The Court explained in Smith that Tennessee Code Annotated section 39-11-112[5] and the principles against the retroactive application of statutes indicated that the legislature did not intend for the 1989 amendments to be applied retroactively to offenses occurring before the effective date of the amendments. 893 S.W.2d at 919.

Our decision in Powers was consistent not only with Smith but also numerous other decisions that have held that capital sentencing proceedings must be conducted in accordance with the statutory law in effect at the time the offense was committed. See State v. Cauthern, 967 S.W.2d

---

[5] Tennessee Code Annotated section 39-11-112 (2003) provides: "Whenever any penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, any offense, as defined by the statute or act being repealed or amended, committed while such statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense."

726, 731-32 (Tenn. 1998) ("heinous, atrocious or cruel" aggravating circumstance); State v. Bush, 942 S.W.2d 489, 505-07 (Tenn. 1997) ("heinous, atrocious or cruel" aggravating circumstance); State v. Hutchison, 898 S.W.2d 161, 174 (Tenn. 1994) (non-statutory mitigating circumstances); State v. Cazes, 875 S.W.2d 253, 267 (Tenn. 1994) (burden of proof and "heinous, atrocious or cruel" aggravating circumstance); State v. Brimmer, 876 S.W.2d 75, 82 (Tenn. 1994) (burden of proof). As we clearly said in Smith, "a criminal offender must be sentenced pursuant to the statute in effect at the time of the offense." 893 S.W.2d at 919.

In the face of this strong precedent, the dissent describes Powers as "unpersuasive" and argues that the decision is distinguishable from our prior decisions.[6] We see no justification for this Court to radically depart from the guiding principle of *stare decisis* by overruling Powers more than one year after its release.

Rather than follow Powers and our controlling decisions, the dissent adopts the State's main argument that the trial court properly applied the 1998 statutory amendment after determining that it was procedural in nature and not substantive. Although the distinction between substantive and procedural law has been recognized by the courts of this state, we have not applied this distinction in capital sentencing. Hutchison, 898 S.W.2d at 176.[7] Moreover, we continue to reject the State's argument in the present capital case for several reasons.

First, as we emphasized in Brimmer, statutes are presumed to operate prospectively unless the legislature has indicated a contrary intention. 876 S.W.2d at 82. Although the State argues that the 1998 amendment to Tennessee Code Annotated section 39-13-204(c) is merely procedural and may be applied retroactively, the plain language of the 1998 amendment does not include a retroactivity clause or any other statutory language that indicates a legislative intent for the amendment to be applied retroactively. In sum, had the legislature intended to depart from the long-established rule that statutes are presumed to apply prospectively, it could have so indicated.

Second, the 1998 amendment to Tennessee Code Annotated section 39-13-204(c) is not simply a procedural change to capital sentencing laws. The 1998 amendment directly impacts an aggravating circumstance that is "more qualitatively persuasive and objectively reliable than others" the prosecution may rely upon to seek the death penalty, i.e., the defendant's prior violent felony convictions under Tennessee Code Annotated section 39-13-204(i)(2). State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993). Moreover, by providing that "[s]uch evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of such evidence is outweighed by prejudice to either party," the 1998 amendment removes the right of the defendant to invoke the exercise of the trial judge's discretion on the issue of admissibility. Similarly, by providing that

---

[6] These and other arguments presently expressed by the dissent were not offered in Powers itself.

[7] Indeed, the dissent cites no criminal cases applying an exception to the rule that statutes are presumed to apply prospectively unless they are procedural or remedial in nature.

"[s]uch evidence shall be used by the jury in determining the weight to be accorded the aggravating factor," the 1998 amendment requires the jury to consider as substantive evidence the circumstances of a prior conviction in determining the weight of the (i)(2) aggravating circumstance.[8]

Finally, the retroactive application of a statute in a criminal case also raises the implication of violating constitutional prohibitions against ex post facto laws. An ex post facto violation under article I, section 11 of the Tennessee Constitution occurs whenever a law (1) "provides for the infliction of punishment upon a person for an act done which, when it was committed, was innocent," (2) "aggravates a crime or makes it greater than when it was committed," (3) "changes punishment or inflicts a greater punishment than the law annexed to the crime when it was committed," (4) "changes the rules of evidence and receives (sic) less or different testimony than was required at the time of the commission of the offense in order to convict the offender," and (5) "in relation to the offense or its consequences, alters the situation of a person to his disadvantage." Miller v. State, 584 S.W.2d 758, 761 (Tenn. 1979) (citing State v. Rowe, 116 N.J. 48, 181 A. 706, 709-10 (1935).

In our view, the application of the 1998 amendment violated article I, section 11 of the Tennessee Constitution. Unlike the statute at the time of the 1991 offense, the 1998 amendment mandated the admission of different and additional evidence underlying the defendant's violent felonies and required that the evidence be considered by the jury in weighing a critical aggravating circumstance relied upon to seek the penalty of death.[9] Additionally, the 1998 amendment and its consequences affected the capital sentence proceeding to the disadvantage of the defendant. See Miller, 584 S.W.2d at 761. Therefore, the 1998 amendment fits within categories four and five of Miller. Id.

The State's reliance on State v. Pike, 978 S.W.2d 904 (Tenn. 1998), is unpersuasive. The issue in Pike involved the retroactive application of an amended procedural rule that simply gave an equal number of peremptory challenges to both the defendant and the State. The amended rule did not disadvantage the defendant and did not fall into any of the other ex post facto prohibitions under article I, section 11 of the Tennessee Constitution. See Pike, 978 S.W.2d at 926-27 (appendix).

---

[8] Given that the 1998 amendment changes the nature and the amount of evidence that may be used to establish an aggravating circumstance, mandates that the evidence be considered by the jury, and removes the trial court's traditional discretion in determining the admissibility of evidence, we disagree with the dissent's conclusion that the 1998 amendment "does nothing other than alter the method by which the jury weighs" an aggravating circumstance.

[9] We disagree with the dissent's assertion that ex post facto provisions are not implicated because the 1998 amendment affected the sentence but not the conviction. First, a capital trial is a bifurcated proceeding in which the jury first determines a defendant's guilt or innocence and then, following a separate sentencing proceeding, determines the appropriate punishment. Tenn. Code Ann. § 39-13-206. See Monge v. California, 524 U.S. 721, 732 (1998) (stating that the sentencing phase of a capital trial is "in many respects a continuation of the trial on guilt or innocence of capital murder"). Second, there is little or no justification to support a holding that the retroactive application of a statute that directly disadvantages a defendant in a sentencing proceeding that determines a sentence of life or the ultimate sentence of death does not violate ex post facto provisions. See State v. Guzek, 86 P.3d 1106, 1118 (Or. 2004) (rejecting the argument that the ex post facto prohibition does not apply to laws that affect penalty-phase proceedings).

In sum, our decision in Powers recognized that the 1998 amendment was not to be applied to cases occurring before its effective date. Powers, 101 S.W.3d at 400. Our decision was based on and consistent with our prior decisions as to the law applicable to capital sentencing hearings, the well-established principle that statutes are presumed to operate prospectively, and the prohibition of laws that violate ex post facto provisions. Accordingly, we adhere to our decision in Powers and related decisions and conclude that the trial court erred in applying the 1998 amendment.

*Harmless Error Analysis*

Our conclusion that the trial court erred in applying the 1998 amendment to Tennessee Code Annotated section 39-13-204(c) does not end our analysis of this issue. Instead, we must determine whether the trial court's admission of evidence underlying the defendant's prior violent felony aggravating circumstance set forth in Tennessee Code Annotated section 39-13-204(i)(2) was reversible error. Powers, 101 S.W.3d at 401.

Prior to the 1998 amendment, this Court had consistently held that it was improper to introduce evidence regarding the facts and circumstances underlying a prior violent felony conviction being used to establish the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(2) where the prior conviction on its face involved violence to the person. Bigbee, 885 S.W.2d at 812.

In Bigbee, the prosecution introduced the facts underlying the defendant's prior conviction for first degree murder, emphasized that the prior first degree murder involved a victim who had been shot three times, stressed that the victim had four children, argued that the jury should consider that the defendant had committed two killings, and suggested that the death penalty was appropriate because the defendant already had received a life sentence for the prior murder. Id. at 810. This Court remanded for a new sentencing proceeding after concluding that the inadmissible evidence and the prosecutorial argument improperly enhanced the aggravating circumstance beyond its statutory language and affected the jury's determination to the prejudice of the defendant. Id. at 812.[10]

---

[10] In addition to emphasizing the facts of the prior felony, the prosecution in Bigbee also argued, in part:

> There was nobody there . . . to ask for mercy for [the victim of the prior offense], none of her children, none of her family. Nobody was there when she was shot the first time to ask for mercy for her life. There was nobody there from her family to ask for mercy when she was shot the second time. . . .
>
> [Y]ou can't escape the fact that [the defendant] has killed two completely innocent human beings, never to see their families again, never afforded the opportunity to ask for mercy. Were [sic] not talking about one life, ladies and gentlemen. We're talking about two lives.
>
> . . . .
>
> We have got two people that are dead because of what [the defendant] did . . . .

(continued...)

Our recent decisions have emphasized, however, that not every violation of the rule in Bigbee requires a new sentencing hearing. In State v. Stout, 46 S.W.3d 689, 701 (Tenn. 2001), for instance, the prosecution relied on the aggravating circumstance set forth in Tennessee Code Annotated section 39-13-204(i)(2) and presented testimony from the victim of an especially aggravated robbery committed by the defendant. In holding that the error did not affect the jury's verdict, we observed that the prosecution used the evidence to establish a separate aggravating circumstance, i.e., that the murder was committed to avoid, interfere with, or prevent a lawful arrest or prosecution. 46 S.W.3d at 701; see also Tenn. Code Ann. § 39-13-204(i)(6) (2003). We also noted that the prosecution did not elaborate on or emphasize the underlying facts to bolster or enhance its reliance on the prior violent felony aggravating circumstance. In short, we held that the case was distinguishable from our decision in Bigbee and that the error was harmless. 46 S.W.3d at 701-02; see also Powers, 101 S.W.3d at 401 (holding that error was harmless in part because the evidence underlying the defendant's prior felonies was used to establish a separate aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(6)).

Similarly, in State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000), the prosecution relied on the defendant's convictions for especially aggravated robbery and attempted first degree murder to establish the prior violent felony aggravating circumstance under Tennessee Code Annotated section 39-13-204(i)(2) and introduced evidence to show that the two prior offenses involved a shooting that occurred shortly before the first degree murder for which the defendant faced the death penalty. Chalmers, 28 S.W.3d at 916. We concluded that the error was harmless because the evidence had been introduced to rebut the defendant's contention that he was not involved in the prior felonies and because the prosecutor's reliance on the underlying facts was not as egregious as in Bigbee. Id. at 917.

With these principles in mind, we turn to the present case. The prosecution introduced detailed evidence regarding the defendant's 1992 conviction for robbery. For example, the victim, Lillian Hammond, testified that the defendant demanded her purse and threatened to kill or harm her if she made any noise. Hammond testified that the defendant made vulgar sexual comments, grabbed her arm, and took her purse.

The prosecution also introduced extensive and graphic proof regarding the defendant's 1998 first degree murder conviction, during which he shot and stabbed the victim, Mary Rebecca Roberts, in 1978 in Rankin County, Mississippi. First, the State introduced the defendant's admission that he hit Roberts, cut her with a knife, and forced her to open a safe from which he took $255 and two guns. Next, the State proved that although the defendant claimed that Roberts was first shot when she grabbed the barrel of his gun, he admitted that he shot the victim a second time because he "wanted to make sure she was dead." The prosecution then introduced evidence, including

---

[10](...continued)
        Two people that are dead. Seven children that are left without parents.

885 S.W.2d at 810.

photographs of the victim, to establish that Roberts had suffered fatal gunshot wounds to her left eye and forehead and a stab wound to her left lung. Finally, the prosecution presented testimony that the defendant showed no remorse for the killing of Roberts.

In our view, the improperly admitted evidence is strikingly similar to that in Bigbee. In both Bigbee and this case, the prosecution introduced the details of a prior first degree murder committed by the defendant. Bigbee, 885 S.W.2d at 802. Indeed, the nature and extent of the inadmissible evidence in this case was even more graphic and detailed than that in Bigbee. Moreover, the improperly admitted evidence in this case was substantially more prejudicial than the prior felonies in the cases in which we held that the error did not affect the jury's verdict. See Powers, 101 S.W.3d at 400-01 (prior convictions for three aggravated assaults and a robbery); see also Stout, 46 S.W.3d at 702 (prior conviction for especially aggravated robbery); Chalmers, 28 S.W.3d at 916 (prior convictions for especially aggravated robbery and attempted first degree murder).

In addition, this case is identical to Bigbee in that the prosecution relied heavily in closing argument on the facts underlying the defendant's prior felony convictions to enhance the effect of this aggravating circumstance. Indeed, the record is replete with the prosecution's repeated emphasis in argument on the facts underlying the prior conviction. For instance:

> It wasn't enough for that killer to have taken Terri Roberts' mother from her when she was seventeen years old –
>
> . . . .
>
> Did he care at all about Mina Ethel Johnson? About Rebecca Roberts? About Lillian Hammond? About the lives that he destroyed? Not for a minute.
>
> You heard testimony that on May 4th [sic], 1978, Rebecca Roberts was found dead in her trailer. You saw the pictures. You heard Detective Simmons talk to you about the investigation. You heard Dr. Sturgis talk to you about the autopsy that he performed.
>
> This is what was left of Becky Roberts. They want you to ignore all of this; to ignore the facts, to ignore the evidence, to put your common sense away, and to feel sorry for this vicious killer, who laughingly displayed Becky Roberts for the whole world to see –
>
> . . . .

-13-

Two families lost love ones at his vicious[,] calculating, manipulative hands. Lillian Hammond was robbed. Scared out of her mind, emotionally harmed. You heard her testify.

The prosecution placed particular emphasis on the graphic evidence underlying the 1978 murder:

And when Detective Simmons and the other officers found Becky Roberts, the chair was pulled right up to the door, so that the first thing you'd see was his handiwork, the work of his vicious, manipulative hands.

. . . .

Going to a woman's trailer because her husband owes you money, stabbing her with a knife until the blade bends to a ninety-degree angle, and then forcing her to the sink where you wash her up, get her cleaned up so you can walk her over to the safe, some thirty yards away, all the time she's dripping blood, dripping blood, dripping blood; making her open the safe, get the money out, walk her back thirty yards to her home, sit her in a chair, and she's begging, she's pleading with you, "Please don't shoot me, please don't shoot me, I won't tell anybody it's you; I'll tell them it's somebody else. I'll make up a name."

Similarly:

It wasn't enough for this cold, violent, manipulative, calculating killer – . . . to walk Ms. Roberts back to the trailer and just leave her. He had gotten the money. He roughed her up. He hurt her. He stabbed her. No. No. He shot her. He shot her in the head. You saw the picture, ladies and gentlemen. You heard Dr. Sturgis tell you about the two bullets that went into her head, basically forming an X. One went one way and one went the other.

Why did you shoot her, Mr. Cold-violent-manipulative killer? "Because I wanted to make sure she was dead. I wanted to make sure she was dead."

Impulse? Impulse, ladies and gentlemen? No way.

Planned out, thought out. Even in the end when [Roberts] was there in the chair bleeding to death, again, alone in her home,

-14-

he's still manipulating the scene. He's still controlling the environment. He pulls the chair out and puts her on display, just like you would mount a trophy on your mantle. A notch in his belt.

Yet another example:

> Stabbing a woman to gain control over her, cleaning her up, walking her thirty yards, forcing her to open a safe, walking her back another thirty yards, setting her in a chair and telling her to shut up so I can think while she is pleading for her life is not impulse . . . . That's cold, manipulative violence that ended in the death of Becky Roberts.
>
> . . . .
>
> You heard the testimony of the murder of Becky Roberts. Of the violent, ugly, horrific manner in which she died. Her eye was shot out. Two bullets formed an X in her brain. It appeared she had been straggled [sic]. The trailer was torn apart, blood everywhere. There's blood back in the bedroom, and there's blood in the living room. Impulse?

Finally, in concluding the argument, the prosecution again emphasized the detailed facts underlying the prior convictions:

> The crime you heard and saw is: "He stood over me when I was on the ground. He had his hand inside here and he made sexually abusive comments to me." That's what [Hammond] said.
>
> . . . .
>
> Look at Ms. Roberts. Look at how she died. Look at why she died. Richard Odom said she died because she knew him, and he didn't want to get caught. Isn't that sad. But what weight should you give it?
>
> You know that you're dealing with an offender, a person, who . . . did this for personal gain and displayed her. It is a reasonable inference to draw that he displayed [Roberts'] body for the next

-15-

person to see. It is a reasonable inference that he alone would have had reason to have drawn that chair out nine feet from the wall. Why was that done? Why was that done? That gives you an insight into him. That gives you an insight into who the real Richard Odom is . . . .

With the record replete with these and other examples of its reliance on the improper evidence, the State's argument on appeal that the evidence and arguments were proper to rebut the defendant's mitigating evidence is not persuasive.[11] First, the argument is dubious because the evidence was presented in the prosecution's case-in-chief when there was no mitigating evidence to rebut. Second, the nature and extent of the evidence presented by the prosecution demonstrates that it was not presented for the sole purpose of rebutting mitigating evidence. Indeed, the prosecution presented an overwhelming amount of evidence that included the victim's testimony regarding the defendant's 1992 robbery, the defendant's first degree murder of Rebecca Roberts, the defendant's statements, the nature and manner of the Roberts killing, the appearance of the Roberts crime scene, including a photograph of the victim, and the details of the autopsy. Finally, the prosecution's arguments as related above went far beyond a legitimate or reasoned effort to rebut mitigating factors and instead enhanced the only aggravating circumstance by including the extensive facts and details of the underlying felonies.

Accordingly, the trial court's erroneous application of the 1998 amendment led directly to the prosecution's introduction of detailed and graphic evidence of prior violent felonies committed by the defendant. The law as it existed at the time of the offense prohibited such evidence. Moreover, the prosecution heavily relied upon the inadmissible evidence underlying the defendant's prior felonies in arguing that the jury should impose the death penalty for the defendant's offense in this case. In short, under these circumstances, as in <u>Bigbee</u>, we conclude that the error affected the verdict. <u>See</u> <u>Bigbee</u>, 885 S.W.2d at 812. We therefore remand for a new sentencing proceeding to be conducted in accordance with the law as it existed at the time of the offense.

Admissibility of Photographs

The defendant next argues that the trial court committed reversible error by allowing the prosecution to introduce photographs of the victim in this case, Mina Ethel Johnson, as well as a photograph of the victim of the 1978 first degree murder committed in Mississippi, Mary Rebecca Roberts. The defendant argues that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice.

---

[11] The State's alternative argument was that the defendant waived the issue for failing to object to the admission of the evidence. The trial court, however, had ruled that the evidence was admissible prior to trial; thus, the defendant has not waived the issue by failing to object contemporaneously with the admission of the evidence in the prosecution's case-in-chief.

-16-

The State argues that the photographs of Johnson were relevant to show the position of her body, the location of the offense, and the nature of the defendant's actions in committing this offense. Similarly, the State argues that the photograph of Roberts showed the defendant's conduct in the 1978 first degree murder offense and rebutted the defendant's contention that his actions were impulsive.

At a re-sentencing hearing, both the State and the defendant are entitled to offer evidence relating to the circumstances of the crime. State v. Teague, 680 S.W.2d 785, 787-88 (Tenn. 1984). A trial court is afforded broad discretion in determining whether to admit photographs of the deceased in a murder prosecution. See State v. Morris, 24 S.W.3d 788, 810-11 (appendix) (Tenn. 2000). The decision to admit photographs will be reversed only if the trial court has abused its discretion. State v. Vann, 976 S.W.2d 93, 103 (Tenn. 1998).

At the time of this offense, Tennessee Code Annotated section 39-13-204(c) stated in part that evidence may be presented in a capital sentencing proceeding as to "any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime . . . ." The statute further provided that "[a]ny such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence . . . ." Id.

In applying these principles, we agree with the Court of Criminal Appeals that the trial court did not abuse its discretion in admitting the two photographs of Johnson. The first photograph, which was three-by-five inches in size, showed the victim in the back seat floorboard of her car and the multiple stab wounds and bleeding she suffered. The second photograph, which was also three-by-five inches in size, showed the victim on the floorboard with her head facing the rear of the car and a rolled up check in her hand. In sum, the photographs were relevant for the prosecution to show the "nature and circumstances" of the crime, i.e., the position of the victim's body, the location of the offense, the defendant's actions, and the injuries suffered by the victim. Moreover, the photographs were not unfairly prejudicial to the defendant.

We disagree, however, with the Court of Criminal Appeals' conclusion that the trial court properly admitted the photograph of the victim of the first degree murder in Mississippi. As we have discussed, the trial court admitted the underlying facts and circumstances of the defendant's prior felonies based on its erroneous retroactive application of the 1998 amendment to Tennessee Code Annotated section 39-13-204(c). Because the photograph of the victim was intertwined with the inadmissible evidence regarding the facts and circumstances of the prior first degree murder, it follows that its admission was improper under the law applicable to this case. See Bigbee, 885 S.W.2d at 811-12.

Moreover, although the State argues that the photograph was properly admitted to rebut the mitigating evidence, we note once more that it was introduced during the State's case-in-chief and not during the State's rebuttal. The trial court's finding that the photograph showed that the defendant's killing of Roberts was "methodical" or otherwise necessary to rebut the mitigating

evidence was not supported by the record.  Instead, the photograph, which shows the victim's body slumped over in a recliner and the wounds suffered by the victim, was of minimal probative value for purposes of sentencing.  Accordingly, we hold that the trial court abused its discretion by allowing the admission of the photograph of the victim of the prior offense.

Continuance

The defendant next argues that the trial court abused its discretion by refusing to grant a continuance to allow psychiatric and neuropsychological evaluations and that the trial court's ruling violated his rights to due process and effective counsel under the United States and Tennessee Constitutions.  See U.S. Const. amend. VI , XIV; Tenn. Const. art. I, §§ 8, 9, 17.  The State maintains that the trial court properly refused to grant a continuance from its scheduled date of September 27, 1999.

The trial court's denial of a continuance will be reversed only if it appears that the trial court abused its discretion to the prejudice of the defendant.  State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995).  An abuse of discretion requires a showing that the denial of a continuance denied the defendant a fair trial or that the result of the trial would have been different.  Id.; see also State v. Mann, 959 S.W.2d 503, 524 (appendix) (Tenn. 1997).  Moreover, a defendant who asserts that the denial of a continuance constitutes a denial of due process or the right to counsel must establish actual prejudice.  See Morris v. Slappy, 461 U.S. 1, 11-12 (1983).

The trial court's written order denying the continuance reflects as follows.[12]  The re-sentencing proceeding was first set for January of 1997 but was continued in December of 1996 in part because the defense requested additional time to find a mitigation expert.  More than a year later, in January and February of 1998, the defense filed an ex parte request for a mitigation specialist and a psychologist.  The trial court granted funds for the mitigation expert but denied funds for a psychologist until the defense made a particularized showing of need.  After several hearings in 1998 to determine the status of the proceedings, the re-sentencing hearing was delayed until after the defendant was re-tried and convicted in July of 1998 of the first degree murder in Mississippi.

In November of 1998, the trial court set the re-sentencing hearing for May 10, 1999.  In March of 1999 – two months before the hearing – defense counsel moved for a continuance on the ground that the defendant's mitigation expert had not completed her investigation.  The trial court granted the motion over the prosecution's objection and set the re-sentencing for September 27, 1999. In April of 1999, the trial court granted the defendant's motion for a psychiatric evaluation by Dr. William D. Kenner.

_____

[12] The complex and lengthy chronology of events is fully and accurately set forth in the Court of Criminal Appeals' opinion, which is attached as an appendix to this decision.

-18-

On September 14, 1999, the defendant filed an ex parte motion requesting that the defendant undergo a neuropsychological evaluation by Dr. Pamela Auble and requesting a continuance so that the evaluation could be conducted on November 1, 1999. Although Dr. Auble's evaluation was requested so that Dr. Kenner could complete his psychiatric examination, the trial court denied the motion because Dr. Auble's evaluation was scheduled to take place after the date of the re-sentencing proceeding. The trial court also denied a continuance.

On September 16, 1999, the trial court entered an ex parte order authorizing a neuropsychological evaluation of the defendant by Dr. Alison Kirk. However, on September 22, 1999, i.e., five days before the scheduled re-sentencing, the defense sought a continuance because Dr. Kirk had determined she lacked sufficient forensic experience to conduct the evaluation. The motion was accompanied by an affidavit from Dr. Kenner asserting that he could not work on the defendant's case unless a neuropsychological evaluation was completed. After finding that the defense had not demonstrated that the defendant had a mental illness or defect that would be used in mitigation, the trial court denied the continuance.

On September 23, 1999, the defendant filed an ex parte motion requesting funds for Dr. Kenner to travel to Memphis to testify. The motion asserted that Dr. Kenner had examined the defendant for 2.5 hours and had reviewed the defendant's records for 7.5 hours. Although the trial court authorized the funds, the defense later moved to continue the re-sentencing proceeding on the basis that Dr. Kenner refused to testify unless a neuropsychological evaluation was completed. The trial court offered to compel Dr. Kenner to attend the trial, but the defense declined. The trial court then denied a continuance.

After setting forth the above chronology and findings, the trial court's written order concluded, in part, that defense counsel "have been given more than enough time to prepare a mitigation defense" and that the period of time was "much more than sufficient to have prepared any mitigation defense, no matter how involved, intricate or complex." The trial court further concluded:

> This Court has done everything in its power to allow the defendant to produce every bit of proof he could muster in his re-sentencing, allowing many continuances over a period of two years and eight months from the first re-sentencing hearing set . . . and has allowed funds for numerous experts . . . . To have permitted yet another continuance to conduct last minute exploratory examinations, for which no basis had been shown in the record, at the last minute . . . would have been in this Court's opinion extremely improper and would be a gross abuse of the judicial process.

After reviewing the record and the trial court's findings, we fully agree with the Court of Criminal Appeals' conclusion that the trial court's refusal to continue the proceeding from the date of September 27, 1999, was not arbitrary, unreasonable, or an abuse of discretion. Moreover, we agree with the Court of Criminal Appeals' conclusion that the defendant completely failed to

demonstrate that the findings or testimony of Dr. Kenner or Dr. Auble would have been favorable to the defense. In short, the defendant has failed to establish that the trial court abused its discretion because there is no indication that he was denied a fair trial or that the result of the proceeding would have been different had a continuance been granted. Accordingly, the defendant is not entitled to relief on this issue.

Sufficiency of Indictment

The defendant contends that his death sentence is invalid because the indictment failed to charge the aggravating circumstance which distinguished this capital first degree murder from a non-capital first degree murder. The defendant, citing Apprendi v. New Jersey, argues that the Fifth and Sixth Amendments require that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 476 (2000); see also Ring v. Arizona, 536 U.S. 584, 602 (2002).

In State v. Holton, 126 S.W.3d 845 (Tenn. 2004), we recently explained that "Apprendi applies only to enhancement factors used to impose a sentence above the statutory maximum" and that "the death penalty is within the statutory range of punishment prescribed for first degree murder by the Tennessee General Assembly . . . ." Holton, 126 S.W.3d at 863 (citing State v. Dellinger, 79 S.W.3d 458, 466-67 (Tenn. 2002)). We also emphasized that Tennessee's capital sentencing procedures require that a jury, not a judge, make the findings regarding the presence of aggravating circumstances and that the findings must be made beyond a reasonable doubt. Holton, 126 S.W.3d at 864; see also Tenn. Code Ann. § 39-13-204(f)(1) (2003).[13]

In short, we have rejected the arguments raised by the defendant, and we have clearly held that Tennessee's capital sentencing scheme does not require that aggravating circumstances be included in an indictment. The defendant's arguments are without merit.

**Conclusion**

After reviewing the record and applicable authority, we now hold as follows: (1) the trial court committed reversible error by retroactively applying a 1998 amendment to Tennessee Code Annotated section 39-13-204(c) and allowing the introduction of extensive evidence regarding the facts and circumstances of the defendant's prior felonies to support the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(2); (2) the trial court did not err in admitting photographs of the victim in this case but did err in admitting photographs of the victim of a felony offense committed in 1978 by the defendant; (3) the trial court did not err in denying the defendant's motion for continuance to complete psychiatric or neuropsychological testing; (4) the death sentence

---

[13] We have also observed that district attorneys are required to notify a defendant of their intent to seek the death penalty no less than thirty days before trial pursuant to Rule 12.3(b) of the Tennessee Rules of Criminal Procedure and that this notice satisfies the requirements of due process. State v. Dellinger, 79 S.W.3d at 467.

was not invalid based on the failure of the indictment to charge the aggravating circumstance; and (5) the issue of whether the death penalty was excessive, arbitrary, or disproportionate in this case under the mandatory provisions of Tennessee Code Annotated section 39-13-206(c)(1)(A)-(D) need not be addressed at this time. We agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues and have included the relevant portions of that opinion in the appendix to this opinion. Accordingly, we reverse the judgment of the Court of Criminal Appeals and remand the case to the trial court for re-sentencing. Costs of the appeal are taxed to the State of Tennessee.

_____
E. RILEY ANDERSON, JUSTICE