IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2017

## STATE OF TENNESSEE v. CHRISTOPHER ORLANDO LYLES

**Appeal from the Circuit Court for Madison County**
**No. 16-398   Donald H. Allen, Judge**

_____

## No. W2017-00292-CCA-R3-CD

_____

The Defendant, Christopher Orlando Lyles, was convicted by a Madison County Circuit
Court jury of first degree felony murder; second degree murder, a Class A felony; two
counts of especially aggravated kidnapping, Class A felonies; three counts of attempted
aggravated robbery, Class C felonies; and aggravated burglary, a Class C felony, and was
sentenced to an effective term of life imprisonment.  On appeal, the Defendant argues
that the trial court erred in granting the State two continuances and that the evidence is
insufficient to sustain his convictions.  After review, we affirm the judgments of the trial
court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT
WILLIAMS and J. ROSS DYER, JJ., joined.

George Morton Googe, District Public Defender; Gregory D. Gookin, Assistant Public
Defender, Jackson, Tennessee, for the appellant, Christopher Orlando Lyles.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior
Counsel; Jerry Woodall, District Attorney General; and Shaun A. Brown and Jody S.
Pickens, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

As a result of events occurring during the early morning hours of July 17, 2015, the Defendant and co-defendant, Phillip Williams, Jr., were indicted for the first degree felony murder and first degree premeditated murder of Beau Reid; especially aggravated kidnapping of James Fisher and Bob Akins; attempted aggravated robbery of James Fisher, Bob Akins, and Beau Reid; and aggravated burglary of James Fisher's residence. Prior to trial, the court granted two motions for a continuance by the State, on April 28 and July 18, 2016. The case proceeded to trial in late October 2016.

The State's proof at trial showed that James Fisher was at his apartment in the Parkway East Apartments in Jackson, Tennessee, around 3:00 or 4:00 a.m. on July 17, 2015. Two men, Bob Akins and Corry Crutchfield, and three women, Brooklyn Willingham, Ebony May and Teniya Miller, were with him, and they were smoking marijuana. Ms. Willingham recalled that the group smoked "eight or nine blunts," and that she was "feeling the effects" of the marijuana. Mr. Akins admitted that he was "getting to the point . . . [o]f being high." At some point, Ms. Willingham and one of the men left the apartment to get cigarettes from a woman who lived elsewhere in the apartment complex. On the way to and from the other woman's apartment, Ms. Willingham noticed the Defendant standing outside in the parking lot and the two exchanged greetings. Ms. Willingham knew the Defendant because she had dated him for one or two months a few months earlier. Ms. Willingham and the man she was with returned to Mr. Fisher's apartment.

About fifteen minutes later, someone knocked on the door of the apartment, and Mr. Fisher answered it. When Mr. Fisher opened the door, two men pushed into the apartment, waving guns and demanding money and marijuana. The intruders were not wearing masks or hoodies, and the lights were on in the apartment. Ms. Willingham, Mr. Fisher, and Mr. Akins identified the Defendant as one of the men who burst into the apartment with a handgun. Neither Mr. Fisher nor Mr. Akins had met the Defendant before that night. The Defendant and co-defendant took a small amount of marijuana and $40 from Mr. Fisher; however, they kept demanding more, asking about pills and "bowls of the weed." In an attempt to leave the apartment and have a better opportunity to escape, Mr. Fisher and Mr. Akins told the Defendant they knew where to get what he wanted, and the Defendant forced them to put on shoes and leave the apartment at gunpoint with him and co-defendant.

Not knowing where to lead the group, Mr. Fisher led them toward the adjacent apartment complex, walking past the surveillance camera in the process. As they walked, the Defendant and co-defendant placed their handguns in their jacket pockets. After the men left the apartment, Ms. Miller realized that she had Mr. Fisher's phone, so the three women drove to the adjacent Lincoln Court Apartments to find him and return the phone. Once they located the men, Ms. Miller tried to give the phone to Mr. Fisher, but the

Defendant demanded that she give it to him instead and then the women drove away. Beginning to think that the Defendant suspected they were lying and might try to escape, Mr. Fisher and Mr. Akins arbitrarily picked an apartment as the location for where the Defendant could get more drugs. Mr. Fisher recalled that, at that point, the Defendant told him and Mr. Akins to "Taliban up"; meaning take off their shirts and wrap them around their faces. The Defendant directed that, once the group got inside, they were going to "lay [the occupants] down, tie them up, and . . . search for the dope." The men started knocking on the front and back doors of the apartment, as well as on the front and side windows.

Mr. Fisher noticed that a man, later identified as Beau Reid, had come out from the back of the apartment and was standing on the side behind the co-defendant. Becoming aware of such, the co-defendant aimed his gun at Mr. Reid. Mr. Fisher went to the front of the apartment where the Defendant was and informed him that "[t]he man came outside." The Defendant moved to the side of the apartment and trained his gun on Mr. Reid as well. With their captors distracted, Mr. Fisher and Mr. Akins ran off. As they ran, both Mr. Fisher and Mr. Akins heard multiple gunshots and turned around and saw the Defendant firing his gun at Mr. Reid. Mr. Fisher and Mr. Akins hid for several minutes and then went to a nearby house and called the police. After the police arrived, they were transported to the police station and gave a statement about the incident. Investigator Ron Pugh with the Jackson Police Department showed both men photographic arrays from which each identified the Defendant as the perpetrator.

Around 5:00 a.m., the Defendant contacted Ms. Willingham by way of a Facebook message and met her at her apartment. The Defendant told her that he was "sorry for what he did, and he didn't know [she] was in the house when they robbed it." He also told her that "he didn't kill nobody."

Tenecia Poston, Beau Reid's fiancé, testified that, during the early morning hours of July 17, 2015, she and Mr. Reid were asleep in the living room of their apartment with their five-month-old son. They had fallen asleep in the living room watching a movie together. At some point, they were awakened by beating on their windows and doors. Mr. Reid, dressed only in his boxer shorts, got up and looked out the side window, where he saw "[a] group of dudes." Mr. Reid went into the kitchen, and Ms. Poston heard the back door unlock. She heard Mr. Reid say, "'All right, man. All right, man'" in a scared tone and then heard "a bunch of gunshots." She ran outside and saw Mr. Reid lying face-down on the ground with a gunshot wound. She heard him trying to breath, but he was "gagging, like gasping, like making a grunting noise." She called 911 and an ambulance took Mr. Reid to the hospital, but he did not survive.

- 3 -

Officer Lance Wright with the Jackson Police Department was on patrol on July 17, 2015, when he received a call that "somebody was shot and lying on the ground" in the Lincoln Court Apartments. On the scene, Officer Wright discovered an African American male, later determined to be Mr. Reid, without a pulse and having "been struck by gunfire." Officer Wright conducted an initial investigation of the crime scene in which he discovered four nine-millimeter spent shell casings near Mr. Reid's body. He also found a kitchen knife in the grass on the south side of the apartment. Investigator Marvin Rodish with the Jackson Police Department processed the scene for evidence. In addition to the evidence found by Officer Wright, Investigator Rodish found an additional spent shell casing "in the general area of the incident," as well as a pair of white tennis shoes.

Agent John Chew with the Tennessee Bureau of Investigation, "TBI," was an officer with the Jackson Police Department at the time of the incident and participated in the execution of a search warrant at the Defendant's residence. As a result of the search, officers collected a "nine-millimeter magazine containing one nine-millimeter Luger cartridge," other bullets and shotgun shells of various calibers, and the Defendant's driver's license.

Doctor Adele Lewis, an expert in the field of forensic pathology, performed the autopsy on Mr. Reid. Dr. Lewis found that Mr. Reid had suffered "numerous gunshot wounds to the chest and abdomen, to the left arm, to the right hand, and to the right thigh." She ruled the official cause of death as multiple gunshot wounds and the manner of death as homicide.

Kristyn Meyers, an expert in DNA analysis and identification with the TBI, examined a knife found at the crime scene. Her testing did not indicate the presence of blood on the knife, and she was unable to obtain a DNA profile to reveal who may have touched the knife.

Doctor Eric Warren, an expert in the field of firearms and ammunition identification and analysis with the TBI, examined two of the bullets recovered from Mr. Reid's body during the autopsy and determined that they were consistent with being of nine-millimeter caliber. However, because the bullets had been damaged, he could not definitively say that they were fired from the same handgun. Another bullet recovered during the autopsy was consistent with being of .32 caliber. Dr. Warren also examined spent nine-millimeter shell casings found at the scene and determined that they were all fired from the same weapon.

The Defendant testified in his own defense at trial. He said that he had lived in the Lincoln Courts area for most of his life. He claimed to have never seen Mr. Fisher or Mr.

Akins outside of the courtroom. He admitted to previously dating Ms. Willingham but denied sending her a Facebook message or meeting with her after Mr. Reid's death. He adamantly denied committing any of the crimes for which he was charged.

Following the conclusion of the proof, the jury convicted the Defendant of first degree felony murder, the lesser-included offense of second degree murder, two counts of especially aggravated kidnapping, three counts of attempted aggravated robbery, and aggravated burglary.

## ANALYSIS

### I. Continuances

The Defendant argues that the trial court erred in granting two motions for a continuance filed by the State.

The granting of a continuance lies within the sound discretion of the trial court, and we will not reverse that decision absent a showing of an abuse of discretion and prejudice to the Defendant. State v. Schmeiderer, 319 S.W.3d 607, 617 (Tenn. 2010) (citing State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004)). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." Id. (quoting State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)).

The record shows that the trial court granted the State's first request for a continuance because a "necessary witness" for the State, an expert from the TBI, was unavailable for the original trial date. The trial court granted the State's second request for a continuance because Bob Atkins was "an essential material witness" for the State, and he had not been located and served with a subpoena.

The Defendant asserts that he was prejudiced by the grant of the continuances because the State was afforded additional time to secure the presence of its witnesses for trial, and he was ultimately convicted. However, a similar argument was made in State v. Goodman, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982), in which this court stated:

> While the appellant might have been acquitted had this damning proof not been introduced, such a result would not have been just. The trial of criminal cases is not a game, but a serious quest for truth about matters of grave importance to our society. Justice is the ultimate goal of every judicial proceeding.

Id. Although the testimony of the State's witnesses was detrimental to the Defendant, a verdict resulting from the absence of this testimony would not have been just. In addition, even without Mr. Akins's testimony, the State would have still had identification testimony from two other witnesses, which mitigates the Defendant's claim of prejudice. The trial court did not abuse its discretion in granting the State's motions for a continuance.

In addition, the Defendant references his right to a speedy trial in his heading on the issue and claims he was deprived of that right. However, he failed to cite any relevant authority or make any argument on the matter and has therefore waived a claim that this right was violated.

## II. Sufficiency

The Defendant challenges the sufficiency of the evidence, arguing that the evidence is insufficient to establish his identity as the perpetrator of the offenses.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). This court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

Again, the Defendant does not allege that the offenses of which he was convicted were not committed. He only challenges the evidence of his identity as the perpetrator. However, the identity of the defendant as the perpetrator of the offense is a question of fact for the jury. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). Here, Ms. Willingham, Mr. Fisher, and Mr. Akins all pointed out the Defendant at trial as one of the individuals who burst into the apartment, waving a handgun and demanding money and marijuana. Ms. Willingham, who knew the Defendant and previously dated him, also testified that the Defendant contacted her soon after the incident admitting that he committed the robbery and was sorry for what he did. In addition, Mr. Fisher and Mr. Akins further testified that the Defendant forced them to leave the apartment at gunpoint, expressed his intent to take "the dope" from Mr. Reid's apartment, and ultimately shot Mr. Reid multiple times. The State introduced evidence that Mr. Fisher and Mr. Akins separately identified the Defendant as the perpetrator from a six-person photographic array.

The Defendant acknowledges the identification testimony of these witnesses but asserts that it is insufficient because Ms. Willingham and Mr. Akins had been smoking

marijuana prior to the events they observed and because Mr. Fisher and Mr. Akins both had a prior conviction. This argument is without merit because, by its verdicts and in its province, the jury accredited the witnesses' identification testimony in spite of the Defendant's attempts to impeach them at trial. The evidence is sufficient to sustain the Defendant's convictions.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE