# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 29, 2010 Session

## STATE OF TENNESSEE v. MICHAEL DEON MILLS AND KENNETH ALLEN SPENCER

### Direct Appeal from the Criminal Court for Knox County
### Nos. 88268A, 88268B      Bobby Ray McGee, Judge

### No. E2009-01708-CCA-R3-CD - FILED APRIL 21, 2011

A Knox County Criminal Court jury convicted the appellants, Michael Deon Mills and Kenneth Allen Spencer, of two counts of especially aggravated kidnapping, one count of especially aggravated robbery, and one count of aggravated burglary. After a sentencing hearing, the trial court sentenced the appellants to effective sentences of twenty-five years in confinement to be served at one hundred percent. On appeal, Mills argues that the prosecutor committed plain error during closing arguments by referring to his failure to testify. Spencer contends that (1) the trial court erred by admitting into evidence a document not provided to him during discovery; (2) the trial court erred by allowing evidence about weapons that were not used to commit the crimes; (3) an accomplice's testimony did not provide sufficient corroboration to support the convictions; and (4) the convictions for especially aggravated kidnapping and especially aggravated robbery violate due process. Based upon the oral arguments, the record, and the parties' briefs, Mills' convictions are affirmed. However, Spencer's convictions are reversed and the charges are dismissed because there is insufficient corroboration to sustain the convictions.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part and Reversed in Part.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Douglas A. Trant, Knoxville, Tennessee, for the appellant, Michael Deon Mills, and Joshua D. Hedrick, Knoxville, Tennessee, for the appellant, Kenneth Allen Spencer.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Phillip Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

## **OPINION**

## **I. Factual Background**

Twenty-two-year-old Brandon Tarver testified that the appellants were his friends. At the time of trial, he had known Michael Mills and Kenneth Spencer three and ten years, respectively. About 6:00 p.m. on August 8, 2007, Tarver and Spencer went to Tarver's father's house on Apex Drive off Sutherland Avenue in Knoxville. Mills also went to the house. At some point, Spencer went back to his home off Magnolia Avenue. Mills also left Tarver's father's home on Apex Drive. Tarver said that he and a girl named Tiffany later met up with Spencer at Spencer's house. At that point, Tarver refused to testify further, saying, "I have nothing else to say. I got my time. I wanna do my time."

Philip Lim testified that in August 2007, he lived in a two-story home on Bradshaw Garden Drive. On the night of August 8, he was at home with his then nineteen-year-old son, Shawn, and thirteen-year-old daughter, Heidi. Shortly before midnight, Philip[1] was standing in his living room while watching television and drinking soup. Someone knocked open the front door, and three or four people wearing bandanas over their faces came into the house. Philip said a black male pointed a "long" gun at his face and told him, "I will kill you. I will kill you." A white male with an aluminum baseball bat hit Philip a few times on his back. Philip ran into the kitchen, and the man with the bat followed him. Philip said that the men wanted to know if he had any drugs and that he told them, "No. I don't have drugs. I don't even smoke." Philip said he was "running scared"; screamed, "Call 911. Call 911"; picked up a barstool; and threw it at the man with the gun. He said that a second living room and his children's bedrooms were in the basement and that he headed downstairs.

Philip testified that he stumbled on the steps to the basement and that the man with the bat began beating him. Philip ran into Heidi's bedroom and tried to hold the door closed, but the man overpowered him, came into the room, and hit him on the head and back with the bat. Philip fought with the man for about five minutes and ran out of the room. The man followed and continued to beat him, and Philip fell next to a couch in the basement living room. The man told him to take off a gold bracelet he was wearing, but Philip could not get the bracelet off because his thumb was swollen. The man beat Philip with the bat, yanked

---

[1]Because the victims share the same last name, we will use their first names for clarity. We mean no disrespect to these individuals.

the bracelet off his wrist, and told him to take out his wallet. Philip did as instructed, and the man took about sixty dollars out of the wallet. The man also pulled a telephone cord out of the wall. Philip took a cellular telephone out of his pocket in order to dial 9-1-1, but the man broke it into two pieces.

Philip testified that the man "cornered" him under a piano and that he told the man, "Please don't kill me. I've got beautiful children." The man forced him to stay under the piano and did not leave him until the police arrived. At that point, the man broke through the basement's sliding glass door and ran outside. The police came into the house and took Philip upstairs, where he saw his son. He said his head and his son's head were bleeding. The police captured a black intruder and a white intruder still in the house. Philip's son asked to see the two men but did not recognize them. Paramedics took Philip to the University of Tennessee Hospital. His thumb was broken, he could not raise his hand, and he had injuries to his neck and back. He said that the man with the bat had hit him twenty or thirty times, that his head was split open, and that he received staples in his head. He was in extreme pain after the attack and went to physical therapy for months. At the time of trial, he was still seeing his doctor for treatment and was in counseling. He said that he did not own a gun or baseball bat and that neither of those items had been in his home before the robbery.

On cross-examination, Philip testified that a briefcase containing jewelry had been in his bedroom closet and that one of the men found the briefcase and opened it. Philip's arms were bruised during the attack when he held them up to protect his neck. He said that the intruders damaged a couch and mattress, that they broke doors and windows, and that blood was "everywhere." The intruders caused eighteen to twenty thousand dollars worth of damage to his house.

Shawn Lim testified that on the night of August 8, 2007, he was downstairs and getting ready for bed. Suddenly, he heard his father upstairs yelling, "[C]all 911, help." Shawn was scared and did not know what was going on. He ran upstairs and saw a tall black male with a bandana over his face and holding a gun. Shawn grabbed the gun and struggled with the man. He said he could not see his father but heard "other commotion" in the kitchen area. Suddenly, someone hit Shawn on the back of his head with a baseball bat. He said he blacked out for a moment, fell over the couch, and was beaten with the bat and the butt of the gun. He said two men told him, "Don't try and be brave or anything, sit down, stay right here." While the men were with him, Shawn could hear his father screaming downstairs. The man with the bat left, and the man with the gun moved Shawn to a bathroom. Shawn grabbed a towel and held it to his head. The man with the gun told Shawn to sit in the bathroom and stayed with him until the police arrived. Shawn said that while he was in the

bathroom, he could see someone with a baseball bat walking "back and forth," searching the upstairs bedrooms. He said he could still hear his father and a commotion downstairs.

Shawn testified that he heard the man with the bat alert the man with the gun, that the two men tried to find a way out of the house, and that he heard a bedroom window break. Shawn saw a police officer, and Philip Lim came upstairs. The police began searching the house and found the man with the bat and the man with the gun hiding in an upstairs bedroom. The police brought them out of the room and took off their bandanas. Shawn said that only one of the intruders was black, and he identified Mills in court as the black intruder with the gun. Regarding an in-court identification of Spencer, Shawn said that "it was dark in the living room . . ., so I'm not sure if he was the one that was in the living room or the one downstairs that I didn't see." He said that as a result of the attack, he had a large cut on his head that had to be closed with fifteen staples. He also had cuts and bruises on his body. He said he was in extreme pain, took pain medication, and stayed in bed for about one week. He said that the home invasion lasted about ten minutes and that he was "out of it" when he talked with the police.

On cross-examination, Shawn said he saw two men during the attack and "heard others." Shawn said that while the man with the bat and the man with the gun were upstairs with him, he could hear his father downstairs yelling "like he was still getting beaten."

The State recalled Brandon Tarver, and his testimony resumed as follows: On the evening of August 8, 2007, Tarver and Spencer drove Spencer's dark green Toyota Camry to Tarver's father's house on Apex Drive. Tarver called Mills and told him to come over. Tarver said that Mills knew about a house "where some guy lived that had some drugs and some money" and that they decided to ride by the house to see if the man was home. Tarver, Mills, and Spencer got into the Camry, and Tiffany drove them to Bradshaw Garden. They saw cars in the home's driveway, and Mills told them the man was there.

Tarver said that Tiffany drove them back to his father's house and that he put a twenty-gauge Remington pump shotgun into the trunk of Spencer's car. He said he could not remember if the shotgun was loaded and did not know at the time that a baseball bat also was in the trunk. Tiffany drove them back to Bradshaw Garden and parked at the end of the street. Tarver, Mills, and Spencer got out of the car and walked to the Lim house. Tarver said that Spencer was carrying the bat, that Mills was carrying the gun, and that they had the weapons in order to scare the occupants of the house. When they arrived at the home, Tarver kicked in the front door. Spencer walked into the house first, followed by Mills and Tarver, and confronted Philip Lim. Shawn Lim came up behind his father and threw Mills onto the couch, and Spencer hit Shawn with the bat. Spencer also hit Philip with the bat, and Philip started screaming. Tarver said his role was to find "the weed and the money," that he walked

-4-

into a bedroom, and that he started searching "[t]o see what they had." He found a briefcase containing jewelry, and he put the jewelry in his pocket. He said that Mills was in the living room and that he did not see Spencer again.

Tarver testified that he heard Shawn Lim ask Mills for permission to get a towel. He heard the home's front door open, and Mills told him the police were there. Mills used the end of the gun to break a window, and Tarver saw police outside. He hid in a closet and Mills hid under the bed, but the police found them. He acknowledged telling an investigator that he had realized as soon as they entered the Lim house that they had broken into the wrong home. He also acknowledged that they continued with their plan. Later, Tarver took the police to Spencer's house off Magnolia Avenue, but Spencer was not there. Tarver used a police cellular telephone to call Tiffany, and she told him Spencer was at Tarver's father's house on Apex Drive. Tarver explained that he had stopped testifying earlier because "[t]hat's two of my best friends [sitting] over there." He said he pled guilty in this case in return for an eight-year sentence. He acknowledged that no one in the district attorney's office had threatened him and that he did not have to testify.

On cross-examination, Tarver testified that he and Tiffany had been dating and that he never told the police she was involved. He acknowledged that after he refused to testify earlier, he spoke with his attorney and that his attorney reminded him he was supposed to cooperate with the district attorney's office as part of his plea agreement. He said he decided to continue testifying because he would "get some more time" if he did not cooperate.

Heidi Lim testified that on the night of August 8, 2007, she was downstairs in her bedroom, which was next to Shawn's bedroom, and heard her father upstairs "yelling help, call 911." She grabbed a cordless telephone and went into Shawn's bedroom, but Shawn was not there. Heidi heard yelling upstairs, but she did not hear Shawn. She dialed 9-1-1 and got down on the floor, trying to hide. The State played Heidi's 911 call for the jury. During the call, which lasted about seven minutes, Heidi told the operator that someone was in her house and that she was hiding in her brother's bedroom. She also told the operator that she could hear someone saying "get on the ground" and that she thought her father had been hurt. Heidi testified that when the police arrived, she ran upstairs. Her father and brother were in the bathroom, and she saw Shawn holding a towel to his bleeding head. She said that her family owned a mixed-breed dog that stayed outside in a fenced yard, that she later found the dog hiding in a basement bathroom, and that his eye was bleeding.

Officer David Sanders of the Knoxville Police Department testified that on August 8, 2007, he responded to a home invasion call on Bradshaw Garden Drive. According to the call, a young woman was in the basement of the home, and the intruders were still in the house. Officer Sanders turned off his patrol car's lights and parked a couple of houses down

from the Lim house. Officer Pete Franzen also arrived, and the two officers walked to the home. Officer Sanders set up a perimeter around the house while Officer Franzen went to the front of the house. Officer Sanders heard the front door slam. A few moments later, a window broke on the side of the house where he was standing. He watched the window, but no one climbed out. Other officers arrived, and Officer Sanders entered the basement through a broken sliding glass door. He checked each room in the basement to make sure no suspects were hiding and found Heidi Lim in a bedroom. He heard officers yelling upstairs, went upstairs, and saw officers taking a white male into custody. The officers were removing the male from the bedroom where Officer Sanders had heard the window break earlier. Officers also took a young black male, who was hiding between the bedroom wall and the bed, into custody. A loaded shotgun was lying on the bed. Officer Sanders took the white male, who was Tarver, outside; patted him down; and found jewelry in his pockets. He put Tarver into his patrol car.

Officer Sanders testified that officers searched the Lim house for a third suspect but never found anyone. A couple of hours later, Officer Sanders went to a house on Apex Drive, which was less than ten miles away from Bradshaw Garden Drive. The police had learned a third suspect was at that location. Police officers knocked on the door, and an older white man answered. The officers asked if Kenneth Spencer was there, and the man said he did not know. He gave the officers permission to search, and Officer Sanders saw someone open a back bedroom door. He said a white male "poked his head out," saw the officers, and closed the door. The officers arrested the man, who was Spencer, and searched the bedroom. Under a mattress, they found a shotgun, a baseball bat, and a metal pipe with tape wrapped around one end. They also found one green bandana and one blue bandana in the room. A green Toyota Camry was parked at the home, and a face mask was in the backseat.

On cross-examination, Officer Sanders acknowledged that when he first arrived at the Lim home, he thought the suspects had a shotgun and a baseball bat. When officers arrested Mills, he was not wearing a bandana over his face. The bat found at the home on Apex Drive was wood, not aluminum, and Officer Sanders could not see any traces of blood on it.

Dan Crenshaw, a senior evidence technician for the Knoxville Police Department, testified that he confiscated the items found at the Apex Drive residence. Partial, but unidentifiable, fingerprints were on the bat and the shotgun. Crenshaw also checked the shotgun found at the Lim residence for fingerprints but did not find any identifiable prints.

Latonia Mills, Michael Mills' mother, testified for him that he was a good child and that she never had any problems with him as a juvenile. She said she did not know Tarver or Spencer.

The jury convicted the appellants of two counts of especially aggravated kidnapping, a Class A felony; one count of especially aggravated robbery, a Class A felony; and one count of aggravated burglary, a Class C felony. After a sentencing hearing, the trial court sentenced the appellants to twenty-five years to be served at one hundred percent in confinement for each of the Class A felony convictions and to six years as Range I, standard offenders for the aggravated burglary conviction. The sentences were to run concurrently for effective sentences of twenty-five years.

## II. Analysis

### A. References to Failure to Testify

Mills contends that the State committed plain error by referring during its closing arguments to his failure to testify at trial. The State argues that the prosecutor's comments were not referring to Mills' failure to testify and that, in any event, the error is not plain error. We agree that the appellant is not entitled to relief.

During the prosecutor's closing argument, he stated, "And you heard from the one -- the only one that has accepted responsibility in this case, Mr. Tarver." During the prosecutor's rebuttal closing argument, he also stated, "At the end of the day what Mr. Tarver told you is unrefuted. Absolutely unrefuted." Neither of the appellants objected to the prosecutor's comments. Mills now argues that the prosecutor was commenting on his failure to testify because only he could have contradicted Tarver's testimony. Moreover, the appellant contends without any analysis or argument that the prosecutor's error rises to the level of plain error.

It is constitutionally impermissible for a prosecutor to comment upon the accused's silence during the course of trial. State v. Transou, 928 S.W.2d 949, 960 (Tenn. Crim. App. 1996). The appellant's failure to make a contemporaneous objection to the prosecutor's comments waives the issue on appeal. See Tenn. R. App. P. 36(a). However, Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time." See also Tenn. R. Evid. 103(d). We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial
> court; (b) a clear and unequivocal rule of law must have been
> breached; (c) a substantial right of the accused must have been
> adversely affected; (d) the accused did not waive the issue for

tactical reasons; and (e) consideration of the error is "necessary
to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'"plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

During his rebuttal closing argument, the prosecutor argued that Tarver's testimony about the appellants' involvement in the crimes was uncontroverted. "Generally, mere argument by the state that its proof is unrefuted or uncontradicted is not an improper comment upon a defendant's failure to testify." State v. Rice, 638 S.W.2d 424, 427 (Tenn. Crim. App. 1982). However, the prosecutor's first statement, that the jury only heard from one person who accepted responsibility for the crimes, arguably could be construed as an indirect reference to Mills' failure to testify. In any event, the trial court instructed the jury, "Since neither defendant took the stand to testify as a witness, you shall place no significance on this fact. . . . He is not required to take the stand in his own behalf. And his election not to do so cannot be considered for any purpose against him." We generally presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Moreover, the evidence against Mills was overwhelming. The police found him hiding in a bedroom of the house with a shotgun lying nearby, Shawn Lim asked to look at Mills immediately after the incident, and he identified Mills at trial as the black male who entered the home and beat him and his father with the gun. The appellant has not explained how the prosecutor's comment constitutes plain error, and, in light of the evidence presented against him, we do not believe plain error exists.

## B. Discovery Violation

As his first argument, Spencer contends that the trial court erred by allowing the State to introduce into evidence a certified document to prove the green Toyota Camry was registered to him. He argues that the document should have been excluded because it was not provided to the defense during discovery. The State contends that it did not realize until trial that ownership of the Camry would be an issue and that it turned over the document to the defense as soon as it received the document. We conclude that the trial court properly allowed the State to introduce the document into evidence.

During the first day of trial, Tarver testified that he and the appellants rode to the Lim house in Spencer's green Toyota Camry. Tarver also testified that a girl named Tiffany drove them to the home. According to Tarver, he had never previously revealed that Tiffany

was involved in the crimes. During the second day of trial, the State requested to introduce into evidence "a certified tag history for this particular tag number that we obtained this morning." The prosecutor informed the court that there could be "some issue as to who that car may belong to" and that "out of an abundance of caution I went down and got a certified tag history indicating it's registered to a Kenneth A. Spencer." Spencer objected to the admissibility of the document on the basis that it was hearsay and that he should have received it during discovery. The State explained that the document was admissible under Tennessee Rule of Evidence 902, the rule regarding self-authentication of documents, and that it turned over the document to the defense as soon as it received the document. The trial court ruled that because neither party had anticipated that ownership of the car would be an issue at trial, it was going to allow the State to introduce the certified document into evidence. On appeal, Spencer does not challenge the admissibility of the document on hearsay grounds. Instead, he argues that the trial court's admission of the document violated Rule 16, Tennessee Rules of Criminal Procedure.

Tennessee Rule of Criminal Procedure 16(a)(1)(F)(ii) provides that upon request, the State must allow a defendant to inspect and photograph or copy documents in the State's possession that the State intends to use during its case-in-chief. If a party fails to comply with a discovery order, a trial court may:

> (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;
>
> (B) grant a continuance;
>
> (C) prohibit the party from introducing the undisclosed evidence; or
>
> (D) enter such other order as it deems just under the circumstances.

Tenn. R. Crim. P. 16(d)(2). This court has previously observed that excluding the evidence is a drastic remedy which should not be implemented absent a showing that the defendant was prejudiced by the State's failure to comply with discovery and the prejudice cannot otherwise be eradicated. State v. James, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984); see also State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995).

The appellant contends that the document was "certainly material" to the State's case because the State relied on it as corroboration of Tarver's testimony and that he was

prejudiced by the State's delay in presenting the document because he "was left without any significant way to deal with this new evidence." However, the State did not know before trial that ownership of the Camry was going to be an issue. As soon as the State realized ownership was going to be an issue, it obtained the certified registration document and provided it to the appellant. Therefore, the State did not violate Rule 16. In any event, the appellant did not request a continuance, which was a possible remedy, in order to investigate the document. See Tenn. R. App. P. 36(a). Furthermore, he did not contend at trial and does not argue on appeal that the document was inaccurate. Therefore, he has failed to show that receiving the document on the second day of trial prejudiced his case.

## C. Weapons Found at Apex Drive

Next, Spencer argues that the trial court erred by admitting evidence about the weapons found under the mattress at the Apex Drive residence because the weapons were irrelevant and offered as propensity evidence prohibited by Rule 404(b), Tennessee Rules of Evidence. The State concedes that there is no proof the baseball bat and pipe found under the mattress were used during the home invasion. However, the State argues that the shotgun was properly admitted as relevant evidence because Officer Sanders testified that it could have been used during the incident, and, given that no fingerprints were found on the gun, it was never excluded as having been used during the robbery. The State also contends that even if the trial court improperly admitted the weapons into evidence, the error was harmless in light of the State's remaining evidence.

Before trial, Spencer filed a motion to exclude from evidence various items collected at the Apex Road home, including a twenty-gauge Browning shotgun and a metal pipe with a tape handle.[2] In the motion, he argued that the items were irrelevant and inadmissible pursuant to Tennessee Rules of Evidence 402 and 403. At a hearing on the motion, which was held just before the parties' opening statements, the appellant argued that the weapons seized by the police, other than the shotgun found at the Lim home and the baseball bat found at Apex Drive, were irrelevant because none of them were used during the commission of the offenses. The State argued that the weapons were relevant because "if you're found in possession of those very type of weapons within a short time after it occurred, then it's relevant to establish identity among other issues." The trial court stated as follows:

> Well, the relevance if it -- if the evidence tends to show that the
> defendant is a person who keeps guns, who keeps the kinds of
> weapons that are used in the crime that would have some

---

[2]The motion did not mention a baseball bat.

relevance. The other part of this is, that this is not a prior bad
act . . . that we're getting into, there's nothing wrong with
having weapons in your home.

Spencer's counsel agreed, stating, "straight 403, not relevant, your Honor. It's not a prior
bad act motion." The trial court overruled the motion.

During the motion for new trial hearing, Spencer argued that the shotgun, wood
baseball bat, and metal pipe found under the mattress were inadmissible because they were
"completely unrelated to this event." The appellant also argued for the first time that the
items were inadmissible under Tennessee Rule of Evidence 404(b) because "[a]ll they do .
. . is to paint these individuals as violent dangerous people who have weapons all about them.
All they do is prejudice the jury." The trial court ruled that because the items were similar
to items used during the home invasion, they "corroborated evidence identifying this
defendant as one of the perpetrators of the crime" and were "highly relevant." The court also
held that because possession of the items was not necessarily a bad act, their admissibility
was not susceptible to prior bad act analysis.

Relevant evidence is "evidence having any tendency to make the existence of any fact
that is of consequence to the determination of the action more probable or less probable than
it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may
be excluded if its probative value is substantially outweighed by the danger of unfair
prejudice, confusion of the issues, or misleading the jury, or by considerations of undue
delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.
Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or
acts is not admissible to prove the character of a person in order to show action in conformity
with the character trait. It may, however, be admissible for other purposes." These "other
purposes" may include prior acts "admitted to prove such issues as motive, intent,
knowledge, absence of mistake or accident, common scheme or plan, identity, completion
of the story, opportunity, and preparation." State v. Morris, 24 S.W.3d 788, 810 (Tenn.
2000) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 404.6 (3d ed. 1995)).
Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant
to an issue other than the accused's character." State v. Luellen, 867 S.W.2d 736, 740 (Tenn.
Crim. App. 1992). In making its decision regarding the admissibility of the evidence, the
trial court must first determine if the evidence is relevant to prove something other than the
appellant's character. If the evidence is relevant, then, upon request, the court will proceed
to a Rule 404(b) hearing.

Although the State now contends that the shotgun found under the mattress may have
been used during the home invasion, the evidence at trial belies that argument because the

victims testified Michael Mills used a shotgun during the robbery, the police recovered a shotgun in close proximity to where they found Mills hiding, and Philip Lim testified that he did not own a gun or have a gun in his home. Moreover, Officer Sanders never testified that the shotgun found at the Apex Drive residence could have been used in the robbery. Instead, he said that he did not know if the shotgun found at the Lim residence had been used during the robbery. Regardless, the prosecution did not argue at the motion to suppress hearing, at trial, or at the motion for new trial hearing that the items recovered from under the mattress were used during the commission of the offenses. Therefore, we conclude that the items were relevant only to show Spencer had a propensity to be around dangerous weapons often used by criminals to commit violent crimes. The trial court should have excluded the weapons, and testimony about them, from evidence.

The appellant specifically stated at the hearing on the motion that he was not arguing the weapons' inadmissibility pursuant to Rule 404(b), Tennessee Rule of Evidence. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Accordingly, we may grant relief only if the trial court's error rises to the level of plain error. Upon our examination of the record, we conclude there is no plain error. The most significant evidence presented against Spencer was Tarver's testimony. Tarver testified that Tiffany drove him, Spencer, and Mills to the Lim home, that they broke into the home, and that Spencer used a bat during the robbery. The jury obviously accredited his testimony. Therefore, although the trial court improperly admitted the weapons found under the mattress into evidence, in light of Tarver's testimony, we conclude that consideration of the error is not necessary to do substantial justice. The appellant is not entitled to relief.

### D. Corroboration

Next, Spencer contends that the evidence is insufficient to sustain his convictions because Tarver's testimony was not sufficiently corroborated. The State argues that Tarver's testimony was sufficient corroborated. We agree with Spencer and conclude that his convictions must be reversed.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be

drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant is correct in that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Stout, 46 S.W.3d 689, 696 (Tenn. 2001), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004). As our supreme court has explained,

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)) (brackets omitted), superseded by statute on other grounds as stated in Odom, 137 S.W.3d at 580-81. But, "[w]hether sufficient corroboration exists is a determination for the jury." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001).

In the present case, the evidence established that Mills and Tarver were the perpetrators who were upstairs with Shawn Lim during the robbery. The jury concluded that Spencer was the robber with the aluminum baseball bat who beat Philip Lim, chased him downstairs, cornered him under the piano, and escaped through the sliding glass door. However, Tarver was the only witness who linked Spencer to the home invasion. Philip could not identify any of the perpetrators of the crimes. Shawn Lim saw Tarver and Mills shortly after the robbery, and he identified Mills at trial as the black male with the gun. However, regarding Spencer, Shawn testified, "I'm not sure if he was the one that was in the

-13-

living room or the one downstairs that I didn't see." No aluminum bat was ever found, and the State presented no evidence that the bat found in the bedroom with Spencer at the Apex Drive residence was used during the robbery.

The State argues that Tarver's testimony was sufficiently corroborated because a green Toyota Camry, the same vehicle Tarver said was used to drive to the Lim house, was found parked outside the residence where the police arrested Spencer. However, the fact that a green Toyota Camry was found at the home does not provide sufficient corroboration because Tarver, an accomplice, was the only witness who testified about the Camry's use during the crimes. The State also contends that Tarver's testimony was sufficiently corroborated because Philip and Shawn Lim stated that the robbers wore bandanas over their faces and used a shotgun or rifle, and Spencer was found in possession of two bandanas and a shotgun. However, there is no evidence linking the shotgun found under the mattress to the crimes, and we have already concluded that evidence about the shotgun was inadmissible. Similarly, the State presented no evidence to show the bandanas found in the bedroom with Spencer at the Apex Drive home were worn by the robbers or related to the crimes in any way. Therefore, the fact that Spencer was found in possession of a shotgun and bandanas also does not provide the corroboration necessary to sustain his convictions. Given that no evidence, aside from Tarver's testimony, establishes Spencer's identity or participation in the home invasion, the evidence is insufficient to support his convictions.

### E. Due Process

Finally, Spencer contends that this court should reverse his especially aggravated kidnapping convictions because the kidnappings were incidental to the robbery, and, therefore, his convictions for especially aggravated kidnapping and especially aggravated robbery violate due process. The State argues that the trial court correctly determined that the convictions could stand. Although we have reversed Spencer's convictions, we will address this issue to facilitate further appellant review. We conclude that the appellant's convictions for especially aggravated kidnapping and especially aggravated robbery are proper under the facts in this case.

The grand jury indicted the appellants as follows: count 1, aggravated burglary; count 2, especially aggravated kidnapping of Philip Lim; count 3, especially aggravated kidnapping of Shawn Lim; count 4, especially aggravated robbery of Philip Lim; and count 5, especially aggravated robbery of Shawn Lim. Before trial, count 5 was dismissed. As charged in this case, especially aggravated kidnapping is false imprisonment accomplished with a deadly weapon. Tenn. Code Ann. § 39-13-305(a)(1). Especially aggravated robbery is robbery where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a)(2). After the State's case-in-chief, Spencer moved for judgment of acquittal, arguing that Tarver's

testimony had been insufficiently corroborated and that the kidnappings had been incidental to the robbery. Regarding the latter argument, the trial court ruled that the jury should determine whether the appellants committed the offenses, and then the court would address the issue, if necessary.

In support of his argument, Spencer cites State v. Anthony, 817 S.W.2d 299, 306 (Tenn. 1991), in which our supreme court held that before a defendant can be convicted of a kidnapping charge, the trial court must determine

> whether the confinement, movement, or detention [was] essentially incidental to the accompanying felony and [was] not, therefore, sufficient to support a separate conviction for kidnapping, or whether it [was] significant enough, in and of itself, to warrant independent prosecution and [was], therefore, sufficient to support such conviction.

The Anthony court noted that "every robbery, by definition, involves some detention against the will of the victim, if only long enough to take goods or money from the person of the victim." Id. The Anthony court held that one method of determining whether the kidnapping was merely incidental to the robbery was to determine "whether the defendant's conduct 'substantially increased [the] risk of harm over and above that necessarily present in the crime of robbery itself.'" Id. (quoting State v. Rollins, 605 S.W.2d 828, 830 (Tenn. Crim. App. 1980)).

The appellant also cites State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), in which our supreme court revisited Anthony. The Dixon court held that the Anthony decision "should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of . . . robbery. Accordingly, any restraint in addition to that which is necessary to consummate . . . robbery may support a separate conviction for kidnapping." Id. at 534-35. In Dixon, 957 S.W.2d at 535, the supreme court established a two-prong test for determining whether a separate conviction for kidnapping violates due process. First, the trial court must determine whether the movement or confinement was beyond that necessary to commit the accompanying felony. Id. If so, the trial court must ascertain whether the additional movement or confinement (1) prevented the victim from summoning help; (2) lessened the appellant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. Id. Subsequently, our supreme court held that "the Anthony analysis should not be used in conjunction with the Dixon two-part test. The Dixon test should be used exclusively in all future inquiries." State v. Richardson, 251 S.W.3d 438, 443 (Tenn. 2008).

The trial court makes the initial determination as to whether a separate kidnapping conviction violates principles of due process. State v. Fuller, 172 S.W.3d 533, 535 (Tenn. 1995) (citing State v. Cozart, 54 S.W.3d 242, 247 (Tenn. 2001)). Our review of the trial court's determination is de novo with no presumption of correctness. Griffin v. State, 182 S.W.3d 795, 798 (Tenn. 2006).

We note that after Spencer moved for judgment of acquittal, the trial court stated that it would address this issue if the jury found the appellants guilty of the kidnapping and robbery offenses. The appellant raised this issue in his motion for new trial. However, at the motion for new trial hearing, the trial court only addressed, very briefly, the especially aggravated kidnapping of Shawn Lim. Furthermore, the trial court did not consider the two-part test in Dixon.

We conclude that the confinement used by the appellants in this case exceeded that necessary for the completion of the robbery. As soon as the appellants entered the Lim home, they began beating Philip Lim without provocation. As Philip tried to flee, the appellants continued to beat him. Shawn Lim came upstairs, and he too was severely beaten. One of the robbers chased Philip downstairs, continued to beat him, and ordered him to stay under the piano. After he had taken Philip's watch and money, he stood over him with the baseball bat until the police arrived. Similarly, Mills ordered Shawn into the bathroom and held him there at gunpoint. The confinements prevented the victims from summoning help and lessened the appellants' risk of detection. Also, given that the robbers had already beaten the victims, their standing over the victims with their weapons drawn demonstrates to us that the victims' continued confinement greatly increased the risk of harm to them. Therefore, we conclude that the appellants' dual convictions for especially aggravated kidnapping and especially aggravated robbery were proper in this case.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, Mills' convictions are affirmed. Spencer's convictions are reversed, and the charges against him are dismissed.

_____
NORMA McGEE OGLE, JUDGE