IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 16, 2014 at Knoxville

**STATE OF TENNESSEE v. JAMES ANTONIO BAGWELL**

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 41300310      John H. Gasaway, III, Judge**

**No. M2014-00017-CCA-R3-CD - Filed February 19, 2015**

A Montgomery County Circuit Court Jury convicted the appellant, James Antonio Bagwell, of two counts of attempted second degree murder, a Class B felony; two counts of aggravated assault while acting in concert with two or more other persons, a Class B felony; and one count of reckless endangerment by discharging a firearm into a habitation, a Class C felony. After a sentencing hearing, the appellant received concurrent sentences of ten years for each Class B felony conviction and five years for the Class C felony conviction for a total effective sentence of ten years. On appeal, the appellant contends that the evidence is insufficient to support the convictions; that the trial court committed plain error by failing to require that the State elect facts to support the attempted murder and aggravated assault charges; and that his effective sentence is excessive and should be served in an alternative to confinement. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are**
**Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ROGER A. PAGE, and ROBERT H. MONTGOMERY, JR., JJ., joined.

Roger E. Nell, Shelby Stack Silvey, and Michael Tyler Howard (on appeal) and Charles S. Bloodworth, Sr. (at trial), Clarksville, Tennessee, for the appellant, James Antonio Bagwell.

Robert E. Cooper, Jr., Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and John Finklea, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# I. Factual Background

In March 2013, the Montgomery County Grand Jury indicted the appellant, Detarius Curry, and "one other unknown black male" for count 1, attempted second degree murder of Tammy Earp; count 2, attempted second degree murder of Evan Hickey; count 3, reckless endangerment by discharging a weapon into the habitation of Shemeka Winters; count 4, aggravated assault of Tammy Earp while acting in concert with two or more other persons; and count 5, aggravated assault of Evan Hickey while acting in concert with two or more other persons. Curry pled guilty to one count of aggravated assault and reckless endangerment, and the appellant proceeded to trial.

At trial, Teresa Zoppe testified that she lived on Barkwood Drive in Clarksville. About 5:30 p.m. on September 24, 2012, Zoppe was doing yard work in front of her house when she heard "some arguing going on." At first, Zoppe thought people were "goofing off and playing around." However, she then heard a man say, "[Y]ou know, go on back home because I'm not going to argue with a child." Zoppe saw a blonde-haired woman make a telephone call. The woman was "[a] little angry," but Zoppe did not see with whom the woman was arguing. After the woman made the call, a car arrived and stopped behind another vehicle that was "sitting on the street." Zoppe said that seven or eight people were standing on the street and that she heard gunshots. Zoppe grabbed her grandchildren, took them inside, and called 911.

On cross-examination, Zoppe testified that she did not see who fired the gun. She acknowledged that a house was for sale on Barkwood Drive at the time of the incident and that she had seen a helium balloon on the "for sale" sign.

The parties stipulated to three 911 calls related to the incident, and the State played the calls for the jury. In the first call, made by Zoppe at 5:39:18 p.m., Zoppe reported that "they're shooting guns at each other." She said that fifteen or twenty people were on Barkwood Drive and that "they're going crazy." In the second call, which was made by Shemeka Winters at 5:40:25 p.m., Winters said that she and her children were in her kitchen and that she was cooking when someone shot out her window. She said that a Chrysler 300 was in a ditch, that she saw a "gold-looking" older car, and that "this gold car come back up the street and shot at them again after my window was broke out." In the third call, which was made by an unidentified female at 5:40:43 p.m., the caller reported the shooting and stated that she saw teenagers arguing "up the street."

Detarius Curry testified that about 5:30 p.m. on September 24, 2012, he and the appellant were at Curry's brother's house when Curry received a telephone call from the appellant's girlfriend, Holly Hobbs. Hobbs and the appellant had a young daughter, and

Hobbs told Curry that "there was a guy down the street trying to fight our little cousin[,] Little Man." Curry said he and the appellant left to "go check it out." They got into the appellant's car, a Mercury Cougar, with the appellant driving and Curry sitting in the passenger seat. Curry said that they were less than one mile from their cousin and that it took less than two minutes to get to the incident on Barkwood Drive. When they arrived, Curry saw a lot of people standing on the street and pointing at Tammy Earp's Chrysler 300. Hobbs was in the crowd and arguing. Curry said that Clinton Hunter, also known as "Little Man," was present but "wasn't really saying anything."

Curry testified that the appellant stopped the Cougar in front of Earp's Chrysler as Earp was getting into the car. Curry and the appellant got out of the Cougar. Curry said that Earp could not move the Chrysler forward because the appellant's car was blocking it and that Earp "[threw the] car in reverse." As Earp began to back up the Chrysler, the appellant started shooting at it. The appellant fired two or three shots and moved "[a] little toward" the Chrysler as he was firing and the car was backing up. The Chrysler went into a ditch, and the appellant stopped shooting. Curry said that he and the appellant got back into the Cougar to leave and that the appellant was driving. As they pulled away, the appellant told Curry to "lean back." Curry leaned back in the passenger seat, and the appellant reached across Curry's chest and "fired a couple more shots." The appellant drove away, dropped off Curry, and said he was going to hide his car. Curry said that he was not mad at the people in the Chrysler at the time of the shooting and that he was in shock when the appellant shot at the car. Curry did not say anything to the appellant or try to stop him. He said he never fired the gun.

On cross-examination, Curry acknowledged that he was a co-defendant in this case but pled guilty to aggravated assault and reckless endangerment. He said he was to be sentenced for the convictions soon but that the State had not promised him anything in exchange for his testimony. When Hobbs telephoned Curry, Hobbs did not say anything about her and the appellant's daughter. Curry said Clinton Hunter was sixteen or seventeen years old and lived on Barkwood Drive. When Curry and the appellant arrived at the scene, Curry thought he saw Evan Hickey in Earp's Chrysler. Defense counsel asked Curry, "[I]f the witnesses testified that the passenger got out [of the Cougar] and started shooting, then that would have had to been you, wouldn't it?" Curry answered, "I mean if that's what they say." He denied that a third person was in the Cougar.

On redirect examination, Curry testified that it may have looked like he fired the shots but that he did not. On recross-examination, Curry acknowledged that he would have defended Hunter and the appellant's daughter against an attack.

Officer Jesse Scott of the Clarksville Police Department (CPD) testified that on

September 24, 2012, he responded to a shots-fired call in the area of Barkwood Drive. He said that when he arrived, "[t]here was definitely a lot of excitement and a lot of people running around the area." Officer Scott noticed a Chrysler 300 "off to the side of the road" and backed into a ditch. He began looking for people with weapons but did not find anyone. Officer Scott walked around the Chrysler and saw a bullet hole in the center of the driver's door. He also saw damage on the roof, just above the driver's seat. He said that Earp was "pretty frantic" and upset and that Hickey was upset but "a little more angry."

Danielle Finney testified that on the afternoon of September 24, 2012, she went to Barkwood Drive to meet Tammy Earp about a house that was for sale. Finney parked in the driveway of the home, and Earp arrived about fifteen minutes later and parked on the street in front of the house. Earp's boyfriend, Evan Hickey, was in the car with her, and Earp and Finney went into the home. As they went inside, Earp "comment[ed] that she had put a balloon on the sign the night before." Finney stated that about twenty minutes later, Hickey came into the house and said "that there was some stuff going on outside and that they needed to leave." Finney was confused, and Earp asked Hickey what was going on. Hickey said he "went down there" and "something about that balloon." All of them went outside, and Earp and Hickey hurried to Earp's car, leaving Finney standing at the side of the house. Finney went around the house to her car and noticed "something going on in the street" and "a lot of really angry people."

Finney testified that the people were standing in front of Earp's car and "were yelling, and mad, and calling them racists and saying that the boyfriend had came down and said something inappropriate; everyone was screaming and mad about that." The crowd's anger was directed at Hickey, who was in the Chrysler by that time, and Finney saw a young blonde woman "just as mad as everyone else." Finney said she heard a "general statement" about "somebody was coming and . . . they'll get it when they get here." Earp got into her car. As Earp started backing up the Chrysler, Finney saw a gray car pull up and stop behind the Chrysler. Three men got out of the gray car. Finney said that Earp backed the Chrysler into a ditch and that "the next thing I know I'm standing there watching somebody shooting at her car." Finney said she decided that she "needed to get out of there," jumped into her car, and "made a donut" in the yard. She said that the gray car passed her as she was leaving and that a few more shots were fired toward the Chrysler. Finney said that she could not see whether the driver or the passenger of the gray car fired the shots but that she "assume[d] the passenger." The next day, the police showed Finney a six-photograph array, and she identified the shooter. The State asked Finney whom she identified, and she answered, "Well up until this moment I didn't know his name." The State asked Finney, "[D]o you see him in court today?" Finney answered that "it's been a year ago and I'm not sure if that was the same person or not to be perfectly honest." The State showed Finney the array she viewed

-4-

the day after the crimes, and she said, "Yeah, that was the shooter. I believe."[1]

On cross-examination, Finney testified that about ten to fifteen people were standing on the street. Finney said that the people were angry at Hickey and that she "gathered . . . that he had obviously walked down there and said something he shouldn't have said." She said Hickey was sitting in the passenger seat of the Chrysler and "seemed a bit scared." Finney acknowledged that she gave a statement to police on September 25, 2012. In the statement, she said the following: While she was waiting for Earp to arrive, she saw an older model gray Cougar drive by the house a few times. Later, the car "screeched to a halt," three African-American males got out, and the men started arguing along with the crowd. Earp told them that she was going to call the police, and one of the males pulled out a pistol and began shooting at Earp as she was backing up the Chrysler. The man continued to shoot at the Chrysler until Earp backed into the ditch. The three males got back into the Cougar and left. However, as the Cougar passed Earp's Chrysler, the passenger in the Cougar "hung out" and fired three more times. Finney said she did not know Detarius Curry and had never seen him before trial.

On redirect examination, the State asked Finney if she was in a position to have seen someone "hanging out the passenger side shooting." Finney answered, "I honestly wouldn't have been in a position to have actually seen someone hanging out of the car because I would have been turning out. I think I just saw the -- like someone hold the gun out and shoot, not necessarily hanging their body out of the car."

Danita Johnson testified that on September 24, 2012, she was driving to visit a friend on Barkwood Court and "came up in the midst" of the altercation. Johnson, who was stopped at a stop sign and facing Barkwood Drive, saw "a lot of people in the road." She said she saw a person shooting at two other people, who were trying to get into a car. A woman got into the car, "slammed" the car into reverse, and lost control, driving the car into a ditch. Meanwhile, the people in the street scattered. Johnson saw a second car drive by and saw the passenger hanging out of the window. The passenger fired three more shots toward the first car. Johnson identified the appellant in court as the person who fired both sets of shots.

On cross-examination, Johnson testified that as she pulled up to the stop sign, she saw a young, white woman. The woman was "irate" and yelling at Earp, who was in the Chrysler. A young African-American male was trying to hold the woman back. Johnson estimated that she was 100 feet from the second car as it drove by with the passenger hanging out of the window. She said that before trial, she looked up the appellant's photograph on

---

[1]During closing arguments, the State argued that Finney identified the appellant.

the Montgomery County Sheriff Department's website.

Evan Hickey testified that on September 24, 2012, he and his girlfriend, Tammy Earp, went to Barkwood Drive because Earp was trying to sell a house there. When they pulled up to the house, Hickey noticed that the balloon from Earp's sign was missing. Earp went inside the house with Danielle Finney, and Hickey looked down the street and saw the balloon tied to a scooter. The scooter was lying on its side on the street about four or five houses away. Hickey walked to the scooter and tore the balloon string off the handle bar. Two boys were playing basketball nearby, and one of them yelled at Hickey. Hickey told him, "[M]an, I just came down here to get my balloon." The boy told him that "that's our balloon," and Hickey replied, "[N]o, this is our balloon, it was on the sign and I came down here to get it." Hickey asked the boy his age, and the boy said he was sixteen. Hickey told him to go home.

Hickey testified that he walked back to the house that was for sale and that the boys followed him. A couple of minutes later, Holly Hobbs arrived and said the balloon belonged to her baby. Hobbs told Hickey that he was "a piece of crap" and that she was going to call "Tido . . . and he's going to come out here and give [you] what [you] deserve." Hickey went into the house and told Earp that they needed to leave. Hickey, Earp, and Finney went outside, and Earp tried to calm Hobbs. Hickey said that Earp and Hobbs "had some words" and that he and Earp got into Earp's car. At that point, a car pulled up and stopped at an angle in front of Earp's car, blocking it. Hickey said that the front passenger got out of the car and that someone "rolled over from the driver's seat" and also got out. A man started shooting at Earp and Hickey, and they ducked down. Earp put her car into reverse and tried to back away but backed into a ditch. Hickey said the shooter walked toward them as he fired the gun and fired about five shots. Hickey said he could not identify the passenger of the car or the shooter.

Hickey testified that the two men got back into the car and drove down the street, which was a dead end. The car turned around and headed toward Earp's car. Hickey said that as the car passed them, someone fired a couple of additional gunshots. A bullet went through the driver's door and would have gone into Earp's leg, but a radio speaker stopped the bullet. After the shooting, Hobbs stated, "[T]hat's what you [mother f***ers] get." Hickey said that he did not touch or try to fight anyone and that he did not use any inflammatory words prior to the shooting.

On cross-examination, Hickey testified that he had a prior conviction for felony theft. He acknowledged testifying at Clinton Hunter's juvenile court proceeding that when the Cougar pulled up and blocked Earp's car, the passenger got out and let out a man from the back seat. Then "the shooting started." About three hours after the shooting, Hickey gave

a statement to police in which he said that two people got out of the Cougar. He testified that he thought five people were in the Cougar, two in front and three in back. He said that when the Cougar arrived, only three people were standing around Earp's car: Hunter, the second young male, and Hobbs. He said he did not see Hunter make a telephone call during the incident, and he denied referring to Hunter as [the "n word,"], stating that "I wouldn't call anybody that. And I wouldn't call him that for the respect of [Earp] and her kids because her kids are African American and I have been with her for five years."

Tammy Earp testified that she worked for private investors by showing their homes that were for sale. On September 24, 2012, Earp was to show a home at 312 Barkwood Drive to Danielle Finney. Earp was supposed to meet Finney at 5:00 p.m. but arrived about twenty minutes late and parked her Chrysler 300 on the street in front of the house. The car was "facing the deadend." Earp's boyfriend, Evan Hickey, was with her but waited in the car while Earp went into the home with Finney, Finney's husband, and Finney's ten-year-old child.

Earp testified that she had put a balloon on the home's yard sign but that she did not notice whether the balloon was still there. At some point, Hickey came into the house and told Earp that "we need to go now." Earp asked what was wrong, and he said again that "we need to go now." Earp stated that Hickey had "a scared look on his face, like it was an emergency," that he grabbed her by the arm, and that everyone exited the home through the side door. Earp and Hickey went to her car while Finney's family got into Finney's car. Earp saw several people standing in front of her car, including "a young girl," who turned out to be Holly Hobbs, and "a young boy," who turned out to be Clinton Hunter. Hobbs was screaming at Earp, and Earp told her to calm down. Hobbs stated, "[F***] you, mother [f***ers], I done called Tito and he's on his way over here and he's going to give you mother [f***ers] what you deserve. Who do you think you are, [bit**], for taking my baby's balloon?" At that point, Earp knew why Hobbs was upset. She said she had never seen Hobbs before that day.

Earp testified that she got into her car and shut the door. Suddenly, a car came "flying back up behind" her Chrysler and stopped. Hobbs and Hunter were screaming, "[N]o, right here, right here." The car then moved in front of the Chrysler, blocking it. Earp said two men got out of the car and "start[ed] shooting." She stated that she "laid down," that she "punched it," and that she backed the Chrysler into a ditch. The men were still moving toward the Chrysler and were shooting at it. They got back into their car, drove to the dead end of the street, and turned around. As they passed the Chrysler, they shot at it again. Hickey screamed for Earp to get down, which she did. She waited a few seconds and "poked her head up" to make sure the men were gone. She called 911 and later identified the appellant as being at the scene. However, she could not identify him as the shooter.

On cross-examination, Earp acknowledged that she had filed a civil lawsuit against the appellant, Curry, and Hobbs. She also acknowledged that Curry had pled guilty to aggravated assault and that she did not submit a victim impact statement for his presentence report.

Officer Jennifer Szczerbiak of the CPD testified that she responded to a shots-fired call on September 24, 2012, and arrived at the scene about one hour after the incident. She recovered three shell casings. She found two of the casings in a grassy area of Barkwood Court and found the third casing on the road in front of 312 Barkwood Drive. Officer Szczerbiak also found a "spent round" in the home of Temeka Winters at 320 Barkwood Drive. The bullet entered the front window of the home and traveled through a wall, and Officer Szczerbiak collected a bullet fragment on the other side of the wall. Officer Szczerbiak prepared a photograph array containing Curry's photograph and showed the array to Danielle Finney. Finney circled Curry's photograph and said he was in the suspect vehicle.

Officer Szczerbiak testified that she obtained recorded jailhouse telephone calls made by the appellant, and the State played excerpts of the calls for the jury.[2] Officer Szczerbiak also read to the jury a letter that the appellant wrote from jail to Assistant District Attorney General John Finklea. In the letter, the appellant apologized to Tammy Earp and said that he "never knew anything like this was going to happen." The appellant said that everything that occurred on September 24, 2012, "was all a misunderstanding" and that he did not want Earp to be afraid of him. He said that God had changed him since he had been in jail and that he wanted to go home because his two children needed him.

At the conclusion of the State's proof, the jury convicted the appellant as charged of count 1, attempted second degree murder of Earp, a Class B felony; count 2, attempted second degree murder of Hickey, a Class B felony; count 3, reckless endangerment by discharging a firearm into the habitation of Winters, a Class C felony; count 4, aggravated assault of Earp while acting in concert with two or more other persons, a Class B felony; and count 5, aggravated assault of Hickey while acting in concert with two or more other persons, a Class B felony.[3] After a sentencing hearing, the appellant received an effective ten-year sentence to be served in confinement.

---

[2]The State did not introduce the recordings into evidence, and they are not in the appellate record.

[3]Ordinarily, aggravated assault by use or display of a deadly weapon is a Class C felony. See Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii), (e)(1)(A)(ii). However, as indicted in this case, a crime of force or violence committed while acting in concert with two or more additional persons is classified one classification higher than if the crime was committed alone. See Tenn. Code Ann. § 39-12-302(a).

## II. Analysis

### A. State's Failure to Elect Facts

The appellant contends that the trial court committed plain error by failing to have the State elect the facts upon which it was relying to establish the attempted murders in counts 1 and 2 and the aggravated assaults in counts 4 and 5, which deprived him of unanimous verdicts. The appellant claims that the proof established one course of conduct involving him and the victims but that, within that course of conduct, the jury could have concluded that he committed two distinct acts. He contends, however, that the State "did not distinguish between the distinct acts and did not elect which act was proffered for which counts." The State responds that the indictment, the proof at trial, and the State's closing arguments provided the jury with sufficient guidance to distinguish the offenses alleged. We agree with the State.

"The doctrine of election of offenses requires that when there is evidence at trial that a defendant has committed multiple offenses against a victim, the State must elect the facts upon which it is relying to establish each charged offense." State v. Brian Montrel Brawner, No. W2010-02591-CCA-R3-CD, 2012 Tenn. Crim. App. LEXIS 269, at *34 (Jackson, May 3, 2012) (citing State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001)). Therefore, if "the State presents evidence showing that more than one offense occurred, but the indictment is not specific as to which offense the defendant is being tried for, it is the responsibility of the trial court to require the State to elect which offense is being submitted to the jury." Id. at *34-35 (citing State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999)). Moreover, "[a] prosecutor's closing argument may effectively serve as an election of offenses." State v. Anthony Allen, No. W2004-01085-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 696, at *43 (Jackson, July 8, 2005). Requiring an election "safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." Johnson, 53 S.W.3d at 631 (citing State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999)).

Initially, we note that the appellant failed to include this issue in his motion for new trial. Therefore, we review the issue for plain error. See Tenn. R. App. P. 3(e); State v. Tommy Dale Taylor, Sr., No. W2008-01006-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 552, at *33-34 (Jackson, July 6, 2009). Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." We may consider an issue to be plain error when all five of the following factors are met:

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

In this case, the indictment alleged in count 1 that the appellant attempted to commit second degree murder "by unlawfully and intentionally or knowingly shooting a firearm into a vehicle occupied by Tammy Earp." Similarly, count 2 alleged that the appellant attempted to commit second degree murder "by unlawfully and intentionally or knowingly shooting a firearm into a vehicle occupied by Evan Hickey." Count 4 alleged that the appellant committed aggravated assault because he "Unlawfully and Intentionally, Knowingly or Recklessly did cause Tammy Earp to reasonably fear imminent bodily injury and used or displayed a deadly weapon." Likewise, count 5 alleged that the appellant committed aggravated assault because he "Unlawfully and Intentionally, Knowingly or Recklessly did cause Evan Hickey to reasonably fear imminent bodily injury and used or displayed a deadly weapon."

The proof established that the appellant and Curry fired at Earp's car twice: first when they arrived at the scene and then shortly thereafter as they were fleeing the scene. During closing arguments, the State argued that the appellant committed all of the offenses as Earp was backing up. Specifically, the prosecutor stated,

> What supports that this man knowingly attempted to kill Mr. Hickey and because Ms. Earp was in the vehicle, he attempted to kill her. He's fifteen feet away, he's shooting as she backs up, he causes this (indicating) a bullet hole in her car that goes -- she is sitting right here in the driver's seat[.] Mr. Hickey is right in the passenger seat. . . .
>
> . . . .
>
> Count four and five deal with aggravated assault, and

-10-

that's when you cause another to reasonably fear imminent bodily injury. The perfect example of reasonably fearing bodily injury is standing in front of someone, holding a gun, don't make me use this. That's a perfect definition of making someone fear imminent bodily injury. Not taking a gun, that's a whole total different thing when you take a gun and level it off and pull the trigger multiple times at a target. This is two separate things. One is don't make me use this, a perfect example. The other is, leveling a gun and firing multiple times.

All the proof in this case that Mr. Bagwell took the gun, had a phone call, took the gun to a place that there was nothing other than a verbal argument, no touching. No physical act at all. They threw out some other words that they want you to think, they said the N word -- so, that gives this man the right to leave his apartment with a gun, fly up in a car, jump out and shoot up this neighborhood.

. . . .

I ask you to find that when Mr. Bagwell got out of that car and leveled that gun and shot multiple times, the casings found on the road, the bullets hit the car twice, that he knowingly attempted to kill Ms. Earp and Mr. Hickey[.]

On aggravated assault, not that he made someone fear when he actually used that gun, leveled it off, that he did make them fear and they are lucky to be alive. I ask you to find him guilty on all counts as charged. Thank you.

In light of the prosecutor's closing argument, we conclude that the State effectively elected the set of facts for which it was trying to establish the offenses. To the extent the appellant is claiming that the State should have elected facts to distinguish the attempted murders from the aggravated assaults, the indictment specified that the act of displaying the weapon justified the aggravated assault charges while the act of shooting into the vehicle justified the attempted murder charges. Thus, we also conclude that no election of facts was required to distinguish the attempted murders in counts 1 and 2 from the corresponding

aggravated assaults in counts 4 and 5.[4]

## B. Sufficiency of the Evidence

Next, the appellant contends that the evidence is insufficient to support the convictions because the State's witnesses "offered two, irreconcilable version of the facts" that failed to establish him as the shooter. The State claims that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"[A] conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Stout, 46 S.W.3d 689, 696 (Tenn. 2001), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004). As our supreme court has explained,

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also

---

[4]At sentencing, the trial court refused to merge counts 1 and 4 or counts 2 and 5. We note that merger would have been improper in this case. See State v. Terrence Justin Feaster, No. E2012-02636-CCA-R3-CD, 2014 Tenn. Crim. App. LEXIS 485, at **21-33 (Knoxville, May 23, 2014) (in which the majority concluded that defendant's dual convictions for attempted voluntary manslaughter and aggravated assault did not violate double jeopardy under State v. Watkins, 362 S.W.3d 530 (Tenn. 2012), and Blockburger v. United States, 284 U.S. 299, 304 (1932)), perm. to appeal granted, (Tenn. 2014).

that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)) (brackets omitted), superseded by statute on other grounds as stated in Odom, 137 S.W.3d at 580-81. "Whether sufficient corroboration exists is a determination for the jury." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001).

Co-defendant Detarius Curry testified that after he received Hobbs's telephone call, he and the appellant got into the appellant's Cougar with the appellant driving and Curry sitting in the passenger seat. The appellant drove to the scene and pulled in front of Earp's Chrysler, blocking it. The appellant and Curry got out of the Cougar, and the appellant began shooting at the Chrysler as Earp began moving the car backward. Curry said the appellant fired two or three shots and moved "[a] little toward" the Chrysler as it was backing up. The Chrysler went into a ditch, the appellant stopped shooting, and he and Curry fled in the appellant's Cougar. Again, the appellant was driving, and Curry was sitting in the passenger seat. The appellant turned around at the dead end and traveled back toward the Chrysler. As the appellant drove by Earp's car, he leaned across Curry and fired out the passenger window.

Numerous witnesses corroborated much of Curry's testimony. Granted, the witnesses gave conflicting testimony as to the number of men in the Cougar and whether the shooter was the driver or the passenger. However, whether the appellant was the man who actually fired the weapon is of no consequence. Although not mentioned by either party, the record reflects that the trial court instructed the jury on criminal responsibility. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the

offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2); State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person."). From the evidence presented at trial, we conclude that a reasonable jury could have found the appellant guilty of the crimes as the principle offender or under a theory of criminal responsibility. Therefore, the evidence is sufficient to support the convictions.

## C. Sentencing

Finally, the appellant contends that his effective ten-year sentence is excessive and that the trial court should have ordered alternative sentencing. The State argues that the trial court properly sentenced the appellant. We agree with the State.

At the appellant's sentencing hearing, Tammy Earp testified for the State that due to the shooting, she could not sleep and had nightmares. She said that the incident had caused her "to look behind [her] back every time [she] turned around" and "to shelter [her] children." She stated, "It's been horrible to not just me but my family."

The appellant testified on his own behalf and acknowledged that in his letter to Assistant District Attorney General Finklea, he apologized to Earp. He also acknowledged that he prepared a statement for his presentence report and that he thought about the statement carefully before he wrote it. In the statement, the appellant said that the incident resulted from his concern about his young daughter, and that, next time, he would call 911 rather than use a gun. He said that as a result of Earp's civil suit, a $3,200 judgment had been entered against him, and he was ordered to pay for damages to her car. At the time of the sentencing hearing, the appellant had been in jail for fourteen months without being involved in any disciplinary actions or fights. He said that he was twenty-three years old, that he was working at White Castle at the time of the crimes, and that he had also worked at We Buy Gold for about three and one-half months. He asked that the trial court grant him some type of supervised release.

On cross-examination, the appellant acknowledged that in his statement for the presentence report, he stated as follows regarding the crimes:

> "I GET OUT, THE MAIN THING THAT WAS ON MY MIND
> WAS IS MY DAUGHTER OKAY AND WHERE SHE WAS
> AT, SO THAT'S WHEN I SEE MY BABY MAMMA AND I
> RUN OVER TO HER AND START ASKING HER WHAT'S

GOING ON AND TO CALM DOWN[.] NEXT THING I KNOW I HEAR GUN SHOTS[.] THAT'S WHEN I PANICKED[,] LOOKED AROUND[,] AND JUMP[ED] BACK INTO MY CAR AND PULLED OFF WITH MY CO-DEFENDANT ON THE PASSENGER SIDE. WHEN I GET TURNED AROUND AND COME BACK PAST THE WOMAN'S CAR THAT'S WHEN MY CO-DEFENDANT PULLS OUT HIS GUN AND STARTS FIRING SHOTS INTO MISS TAMMY EARPS CAR, NEVER KNOWING HE HAD THE GUN AT ALL BECAUSE IT ALL HAPPEN[ED] SO FAST."

The appellant acknowledged that his version of the events was "extremely contrary" to the proof at trial.

The appellant also made a statement to the trial court, saying that he was "sorry for all of this" and that he turned himself in to the police the day after the crimes and wrote the letter to General Finklea because he "didn't mean for any of this to happen." He apologized again to Tammy Earp.

The State introduced the appellant's presentence report into evidence. In the report, the appellant stated that he did not finish high school because he was expelled for excessive tardiness and that he did not obtain his GED. The appellant described his mental and physical health as excellent and said that he did not use prescribed medications. He stated that he currently was not using any nonprescribed medications or illegal drugs. He said in the report that he began using alcohol when he was twenty-one years old but had not consumed alcohol since he was twenty-two and that he began using marijuana when he was eighteen but stopped when his daughter was born. The report showed that the appellant had two children, a three-year-old daughter and a one-year-old son. According to the report, the appellant had two prior convictions for misdemeanor reckless endangerment and was found to be in violation of probation previously.

The trial court stated that it had considered the evidence at trial, the appellant's presentence report, the principles of sentencing, the arguments regarding sentencing alternatives, and the nature and characteristics of the criminal conduct involved. The court applied enhancement factor (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," to all of the appellant's sentences. Tenn. Code Ann. § 40-35-114(1). The court applied the following enhancement factors to the sentences for the attempted murders and aggravated assaults in counts 1, 2, 4, and 5: (3), that the offense involved more than one

victim; (9), that the defendant possessed or employed a firearm during the commission of the offenses; and (10), that the "defendant had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(3), (9), (10). In mitigation, the trial court found that the appellant had expressed genuine remorse. See Tenn. Code Ann. § 40-35-113(13).

For the Class B felony convictions, the trial court sentenced the appellant to ten years, the midpoint in the range for a Range I, standard offender. See Tenn. Code Ann. § 40-35-112(a)(2). For the Class C felony conviction, the trial court sentenced him to five years. See Tenn. Code Ann. § 40-35-112(a)(3). Regarding alternative sentencing, the trial court concluded that confinement was necessary to avoid depreciating the seriousness of the offenses. The court ordered that the appellant serve the sentences concurrently for a total effective sentence of ten years.

In sentencing a defendant, the trial court shall consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). "[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). The court has specifically held that the abuse of discretion standard, with a presumption of reasonableness, also applies to a review of a denial of alternative sentencing. State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). The appellant's sentences meet this requirement. Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). The appellant is not considered to be a favorable candidate for alternative sentencing with regard to his attempted murder convictions. Tennessee Code Annotated section

-16-

40-35-103(1) sets forth the following sentencing considerations which are utilized in determining the appropriateness of alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

See also State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

The appellant contends that the trial court should have sentenced him to the minimum punishment in the range for all of his convictions, eight years for the Class B felonies and three years for the Class C felony. See Tenn. Code Ann. § 40-35-112(a)(2), (3). He also contends that the trial court erred by denying his request for alternative sentencing because, although the trial court mentioned the three sentencing considerations for alternative sentencing, the trial court "focused only on avoiding depreciating the seriousness of the offense." The appellant claims that alternative sentencing was appropriate in this case because he was only twenty-two years old at the time of the crimes, repeatedly expressed genuine remorse, had young children, served fourteen months in confinement without any disciplinary problems, had a job at the time of the incident, and had potential for rehabilitation.

Initially, we note that the trial court misapplied enhancement factor (3), that the offenses involved more than one victim. The trial court did not explain why it found that factor applicable. However, the only victims in this case were Earp, Hickey, and Winters, all of whom were named in the five counts of the indictment. As this court has stated, "the multiple victim factor is not applicable when separate convictions are based upon the

-17-

existence of the separate victims." State v. Kerry D. Hewson, No. M2004-02117-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 1075, at *19 (Nashville, Sept. 28, 2005). Given that the jury convicted the appellant of separate felony convictions related to all of the victims, the trial court could not apply enhancement factor (3) to the sentences. In any event, the trial court properly applied the remaining enhancement factors. As our supreme court has explained, a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed . . . . So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Bise, 380 S.W.2d at 706. Therefore, we cannot say that the appellant's ten- and five-year sentences are excessive.

Regarding the trial court's denial of alternative sentencing, the trial court carefully summarized the facts of this case during the sentencing hearing and concluded that confinement was necessary to avoid depreciating the seriousness of the offenses. In denying alternative sentencing on that basis, the criminal act should be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree. Zeolia, 928 S.W.2d at 462. We agree with the trial court that the circumstances here are indeed offensive, excessive, and of an exaggerated degree. The evidence established that the appellant's altercation with the victims resulted from a simple helium balloon; that the appellant was not even present when Hickey retrieved the balloon from the scooter but acted in response to a telephone call from the child's irate mother; and that he began firing at the unarmed victims as soon as he arrived at the scene, striking a home where a woman and her children were present. Therefore, we agree with the trial court that the seriousness of the offenses alone supports the denial of alternative sentencing.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE